# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Downs v. Rosenthal Collins Group, L.L.C.*, 2011 IL App (1st) 090970

---

| | |
|---|---|
| Appellate Court Caption | MICHAEL A. DOWNS, Individually; and ROSENTHAL COLLINS GROUP, L.L.C., Derivatively By Michael A. Downs, Plaintiffs-Appellees, v. ROSENTHAL COLLINS GROUP, L.L.C., Defendant-Appellant (Dreadnought Partners, L.L.C.; Knot, L.L.C.; J. Roberts Collins; and Leslie Rosenthal, Defendants). |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-09-0970, 1-09-2091 cons. |
| Filed | December 16, 2011 |
| Rehearing denied | January 30, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from plaintiff's termination from his position as chief executive officer of defendant company, the judgment finding that plaintiff owned 2.5% of defendant and awarding him profits from the time of his termination plus prejudgment interest on that award was reversed, but the finding that plaintiff did not have additional 4% equity interest was affirmed, since plaintiff did not execute a promissory note for the "book value" of the 2.5% interest as required by his employment agreement, and the evidence did not support plaintiff's contentions that defendant waived the requirement of a note, that there was an oral contract granting plaintiff an additional 4% ownership interest, and that he was entitled to additional compensation based on the doctrine of *quantum meruit.* |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CH-11729; the Hon. Leroy K. Martin, Judge, presiding. |
| Judgment | Reversed in part; affirmed in part. |

| Counsel on Appeal | Wolin, Kelter & Rosen, Ltd., of Chicago (Jeffrey Schulman and Elizabeth Schutte, of counsel), for appellant. |
|---|---|
| | Sperling & Slater, P.C., of Chicago (Steven C. Florsheim, Daniel A. Shmikler, and Michael G. Dickler, of counsel), for appellee Michael A. Downs. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion. <br> Justice Garcia concurred in the judgment and opinion. <br> Presiding Justice R. Gordon concurred in part and dissented in part, with opinion. |

## OPINION

¶ 1 Following a bench trial, a declaratory judgment was entered awarding plaintiff, Michael Downs, 2.5% equity interest in defendant company, Rosenthal Collins Group, L.L.C. (RCG), and the resulting profit/loss distributions since his termination from the company in 2004. The court additionally found that plaintiff was entitled to statutory prejudgment interest.[1] The court, however, concluded that plaintiff did not have an additional 4% equity interest in RCG, as claimed by plaintiff.

¶ 2 On appeal, RCG contends the trial court's finding that plaintiff owns 2.5% of the company and is entitled to the resulting profit/loss distributions was against the manifest weight of the evidence because plaintiff failed to execute a promissory note to purchase the equity interest as required by the parties' employment agreement. Additionally, RCG contends the trial court erred in calculating the requisite "book value" that plaintiff owed for his equity interest. RCG further contends the trial court's award of prejudgment interest was erroneous.

¶ 3 Plaintiff cross-appeals, contending the trial court erred in concluding he does not own an additional 4% of RCG. In the alternative, plaintiff contends he is entitled to damages pursuant to the equitable principle of *quantum meruit*.

¶ 4 Based on the following, we reverse the judgment of the trial court finding that plaintiff owns 2.5% of RCG and awarding him profits since 2004 and going forward. We consequently reverse the trial court's award of prejudgment interest on that award. We, however, affirm the trial court's judgment finding that plaintiff did not obtain an additional 4% equity interest in the company.

---

[1]The court also awarded summary judgment in favor of plaintiff on a claim for severance pay and awarded prejudgment interest on that claim. Neither ruling is contested on appeal.

¶ 5                                            FACTS

¶ 6          In August 1997, plaintiff became the chief executive officer (CEO) of RCG. At that time, RCG was a limited partnership with J. Robert Collins and Leslie Rosenthal as its general partners. The parties entered an employment agreement on August 1, 1997. The employment agreement described plaintiff's position as having "supervisory responsibility over all day to day trading, administrative, operation and financial matters," while also serving as "the senior executive with respect to the trading financial, operational, business development and administrative matters of [RCG], subject, however, to the advice and direction of the [majority owners]."

¶ 7          In addition, the employment agreement provided plaintiff with an annual salary of $350,000 and the right to purchase, at "book value," a 2.5% limited partnership interest in RCG by executing a promissory note. "Book value" was not defined in the employment agreement. It is undisputed, however, that plaintiff never executed a note at "book value" for his interest in RCG.[2]

¶ 8          The employment agreement contained an integration clause providing:

"This Agreement constitutes the entire agreement between the parties and contains all of the agreements between the parties with respect to the subject matter hereof. This agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter hereof. No change or modification of this Agreement shall be valid unless the same be in writing and signed by the parties hereto. No waiver of any provision of this Agreement shall be valid unless in writing and signed by the person or party to be charged."

¶ 9          According to his testimony at trial, prior to accepting his position at RCG, plaintiff was employed elsewhere and was not looking for employment. Plaintiff, however, stated that he was induced to accept employment with RCG based on the salary offer and the offer for the right to ownership. Plaintiff testified that he had three conversations with Collins in 1997 and 1998 regarding the execution of a note for his RCG equity interest. Plaintiff testified that he offered to execute the requisite note, but Collins declined because the "book value" of RCG was "unknown, subjective, and difficult to determine" due to an outstanding receivable owed by Rosenthal to the company. Collins disputed the existence of these conversations.

¶ 10         Plaintiff testified that he believed the "book value" at the time he joined RCG in 1997 was approximately $5 million. Plaintiff's calculation was based on the fact that Collins had $11 million equity in RCG, but Rosenthal owed $6.6 million to the company. According to plaintiff, RCG was therefore worth $5 million and 2.5% of that "book value" was approximately $125,000. Richard Horgan, RCG's chief financial officer (CFO), testified regarding his opinion of how to calculate "book value," as did an expert for each party. All

_____

[2]Simultaneously, George Spaniak hired plaintiff as CEO of Prime International Trading Ltd. (Prime). Spaniak was the principle of Prime and a longtime associate of RCG. Spaniak was responsible for connecting plaintiff with RCG. In conjunction with his employment at Prime, plaintiff also had the opportunity to purchase a 2.5% equity interest in Prime upon execution of a promissory note at "book value," which he completed when he started his position with Prime.

three witnesses agreed that "book value" is determined based on the equity of all classes of members. None of these individuals, however, provided a valuation of the "book value" of RCG in 1997 or 2.5% thereof. Horgan did testify that the "book value" of the company when it was a limited partnership was calculated based on the total equity of both general and limited partners.

¶ 11     In October 1998, the company changed to a limited liability company. RCG's operating agreement contained three classes of members. The general partners under the limited partnership became class A members and the limited partners became class C members. Collins and Rosenthal were the only class A members, as majority owners and managing members. According to the operating agreement, class A members had the sole authority to carry out management responsibilities and control the operations of the firm. Plaintiff was a nonvoting class C member. As a class C member, plaintiff owned less than one-tenth of 1% of RCG. Class C memberships were given in exchange for a $100 capital contribution. The operating agreement gave the class A members the sole discretion to make cash distributions "in such amounts and at such times" as determined by their unanimous consent. Moreover, pursuant to the operating agreement, the class B and C members gave the class A members the right to purchase their interests and execute a full assignment of those interests at any time provided the class B or C member was given a five-day notice period. Class C members did not participate in the management of the firm. Class C members had the ability to withdraw their capital at any time.

¶ 12     In 1999, plaintiff received compensation over and above his salary in relation to August 1997 through the year-end and for 1998. Up until that point, plaintiff received only his salary. The parties dispute the character of this compensation. According to plaintiff, the money he received was his 2.5% equity distribution for the relevant time. According to Rosenthal, the monies were provided as a performance-based bonus and not in relation to any ownership interest. Thereafter, the parties agree that plaintiff received a 2.5% distribution through 2002; however, Rosenthal maintained that the monies were part of a bonus-based profit-sharing allocation, whereas plaintiff considered the distributions to be related to his ownership interest.

¶ 13     In late 2001 or early 2002, Collins was absent from RCG for approximately six months due to illness. According to plaintiff, his responsibilities at RCG grew as a result, even continuing once Collins returned to work. Plaintiff testified that he and Rosenthal verbally negotiated an additional 4% ownership interest for a total of 6.5% in relation to his increased responsibilities, and he received 6.5% profits thereafter. Rosenthal testified that he agreed to the increased percentage, but considered it an increase in profit-sharing allocation and not any form of equity in the company.

¶ 14     On January 5, 2004, RCG gave plaintiff notice of his termination. Collins and Rosenthal exercised their right and option, as class A members, to purchase plaintiff's class C membership interest for $100. Plaintiff did not cash the check.

¶ 15     Plaintiff filed the underlying lawsuit requesting, in relevant part, a declaratory judgment that he held a 6.5% ownership interest in RCG and the entry of an injunction requiring defendants to provide him with his share of the profits. In the alternative, plaintiff claimed

defendants breached the employment agreement where he performed all of his obligations under the contract except for executing the note, performance of which was waived by defendants, yet defendants failed to provide plaintiff his contractual equity.

¶ 16 The trial court ultimately concluded that plaintiff held a 2.5% ownership interest in RCG and was entitled to profit/loss distributions since his employment in 1997 and on a going-forward basis. The court, however, expressly found that RCG did not waive its right to a note for the "book value" of the ownership interest. As a result, the court determined that the parties should be placed in the position they would have been had the note been executed in 1997. The court's decision was based on witness testimony, finding "the parties entered into a contract. And that contract called for Mr. Downs to possess two and a half percent of an interest in the business, provided he executed a note and paid book value. It appears *** that on several occasions, Mr. Downs attempted to do so and was thwarted in his efforts by the actions of the defendant." The decision was further based on the 2.5% distributions that RCG paid plaintiff "early on in their relationship," which were "consistent with [plaintiff's] ownership in the business."

¶ 17 The court provided:

"And I don't believe it is fair–equitable that the defendants should rely upon their failure to supply Mr. Downs with the information that he requested and rely upon that as a basis to deny that he owns two and a half percent.

Though it is true, he never executed the note, he never paid the defendants for the two and a half percent, I believe that his lack of performance was attributable to the impossibility of performing. And that impossibility was as a result of the conduct of the defendants. And I don't think, therefore, that he should be penalized for that.

So I am of the opinion and it is my finding today that Mr. Downs does, in fact own two and a half percent. He should be awarded two and a half percent. I also, in that same vein, gentlemen, I reject the idea that the defendants, however, have waived receiving payment from the two and a half percent because of their actions. I think that what the Court ought to do is attempt to put the parties where they should have been, had the transaction been consummated the way it should have been consummated.

So, therefore, I think it only equitable that Mr. Downs compensate, pay to the defendant, as was contemplated in their agreement, the two and a half percent of book value as it existed in 1997 when Mr. Downs first went to work for RCG."

The court noted that it begrudgingly was forced to accept plaintiff's "book value" of the company as of 1997 because "the Court isn't allowed to speculate" and it "didn't hear anything from defendants as to what the value was in 1997."

¶ 18 In regard to plaintiff's claim for an additional 4% interest, the trial court concluded there was no "meeting of the minds" between the parties where material elements of the contract were missing and, therefore, no contract was formed. As a result, the court denied plaintiff's claim for an additional 4% ownership interest in RCG despite recognizing that plaintiff did receive an additional 4% "distribution."

-5-

¶ 19                                    DECISION
¶ 20                            I. 2.5% Ownership Interest
¶ 21    RCG contends the trial court erred in holding that plaintiff had a 2.5% ownership interest in the company where he failed to comply with the terms of the parties' employment agreement by not performing the condition precedent, *i.e.*, executing a note, in order to obtain an ownership interest. Plaintiff accepts that the execution of the note was a condition precedent. "A condition precedent is a condition which must be performed before there is formation of a contract binding on the parties." *Wasserman v. Autohaus on Edens, Inc.*, 202 Ill. App. 3d 229, 235, 559 N.E.2d 911 (1990). Plaintiff contends the evidence supported the trial court's finding where RCG waived the condition precedent.

¶ 22    The parties dispute the question presented on appeal and the applicable standard of review. RCG contends the question is one of contract interpretation; therefore, we must apply the *de novo* standard to the question of law. See *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 288, 565 N.E.2d 990 (1990). Plaintiff, instead, contends the question before us is one of fact because the trial court made factual determinations to support its ultimate conclusion that plaintiff was an owner of RCG. See *id*. Plaintiff, therefore, contends the trial court's finding is subject to deference, such that it may not be overturned unless it is against the manifest weight of the evidence. *Lozman v. Putnam*, 379 Ill. App. 3d 807, 820, 884 N.E.2d 756 (2008). We conclude that the initial question, namely, whether plaintiff obtained an ownership interest in RCG pursuant to the terms of the employment agreement, is one requiring the interpretation of the parties' contract. Therefore, we begin by reviewing the trial court's decision *de novo*. *Dallas v. Chicago Teachers Union*, 408 Ill. App. 3d 420, 427, 945 N.E.2d 1201 (2011).

¶ 23    The main objective of contract interpretation is to ascertain the intention of the parties. *Thompson v. Gordon*, 241 Ill. 2d 428, 441, 948 N.E.2d 39 (2011). In order to do so, a court must look to the language of the contract as a whole, taken in context. *Id*. Where the terms are unambiguous, a court must apply the language as written, given its plain, ordinary, and popular meaning. *Id*.

¶ 24    The parties do not allege the employment agreement was ambiguous. We, therefore, must turn to the express language of the contract to ascertain the parties' intent. At issue is the provision within the employment agreement that provides plaintiff with a right to purchase equity in RCG. The provision stated: "In addition to the base salary ***, concurrent with the execution of this agreement, Employee shall be entitled to acquire, at book value, a 2.5% limited partnership interest in [RCG] ***. The acquisition of the aforementioned interests shall be funded through a note." Consequently, the employment agreement explicitly provided that, in order for plaintiff to receive a 2.5% equity interest in RCG, he was required to execute a note for the "book value" of that interest. There is no dispute that plaintiff failed to execute a note for the "book value" of RCG. "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used. [Citation.] Further, when parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect." *Thompson*, 241 Ill. 2d at 442. The parties

agreed on the language of the employment agreement. Plaintiff, therefore, agreed that, as a condition precedent to obtaining his ownership interest, he was required to provide a note to RCG for 2.5% of the company's "book value." Plaintiff did not comply with the terms of the agreement and, consequently, did not purchase an ownership interest in RCG.

¶ 25 The parties included an integration clause in the employment agreement such that it superseded any and all prior contracts, oral or written, and any changes to the agreements or waivers thereof had to be in writing. "Where parties to a contract include an integration clause, 'they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence.' [Citation.] Thus, in interpreting the contract, the court examines the language of the contract alone, without considering extrinsic evidence of prior negotiations." *L.D.S., LLC v. Southern Cross Food, Ltd.*, 2011 IL App (1st) 102379, ¶ 30. Accordingly, plaintiff's testimony regarding the negotiations of the terms of his employment, namely, that he left his prior employment because of the ability to become an owner of RCG, is extrinsic evidence with no relevance. Further, it is undisputed that the terms of the employment agreement were not modified in writing nor that either party waived those terms in writing.

¶ 26 Notwithstanding, plaintiff argues that RCG waived the condition precedent through the actions and deeds of Collins and Rosenthal, resulting in him obtaining the 2.5% ownership interest. Primarily, plaintiff relies on three conversations taking place after the parties entered the agreement during which Collins advised him that Collins was unable to ascertain the "book value" of the company and, therefore, failed to provide plaintiff with the requisite amount for the note. Plaintiff additionally argues that RCG's actions supported a finding of waiver where plaintiff continually received 2.5% distributions on a yearly basis.[3]

¶ 27 We recognize that "[a] party to a contract may waive performance of a condition precedent by the other party where the condition precedent is intended for the benefit of the waiving party." *Catholic Charities of the Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 309, 741 N.E.2d 651 (2000). Waiver may be established by conduct demonstrating that strict compliance with the contractual provision will not be required. *Whalen v. K mart Corp.*, 166 Ill. App. 3d 339, 343, 519 N.E.2d 991 (1988). An implied waiver of a right may be shown when the conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive the right. *Id.*

¶ 28 The potential for waiver of a condition precedent through actions or deeds involves a question of fact to which we defer to the trial court. *Sosin v. Hayes*, 258 Ill. App. 3d 949, 952, 630 N.E.2d 969 (1994). We will not overturn the judgment of the trial court unless it is against the manifest weight of the evidence. *Id.* A trial court's judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear unreasonable, arbitrary, or not based on the evidence. *Lozman*, 379 Ill. App. 3d at 820.

¶ 29 We conclude the evidence supported the trial court's finding that RCG did not waive its right to a note for 2.5% of the "book value" of the company. We, however, conclude the trial

---

[3]Up until 2002, when he began receiving 6.5% distributions.

court's finding that plaintiff obtained 2.5% ownership interest without complying with the condition precedent was inherently inconsistent with the finding of nonwaiver and, therefore, was against the manifest weight of the evidence. Evidence supporting the finding that RCG did not waive its right to receive the note at "book value" cannot also support a finding that RCG provided plaintiff with his 2.5% ownership interest without first obtaining the note. Because the court determined that RCG's actions and deeds did not demonstrate an intent to waive performance of the condition precedent, the employment agreement required plaintiff to execute the note *prior to* receiving his equity interest. It is undisputed that plaintiff did not execute the note; therefore, based on the evidence, plaintiff is not entitled to 2.5% equity of RCG.

¶ 30    The record demonstrates the trial court's findings were based on the fact that plaintiff had received 2.5% distributions since 1997, that RCG failed to provide plaintiff with the "book value" for his interest, and that RCG's actions created an impossibility for plaintiff to perform the condition precedent. We discuss the evidence related to those findings in turn.

¶ 31    RCG began paying plaintiff the disputed 2.5% in 1999. At that time, plaintiff was given a bonus for his services with RCG beginning in 1997 and then was paid 2.5% through 2002, when he began receiving 6.5% until his termination in 2004. The evidence demonstrated that the additional 2.5% compensation was an annual profit sharing bonus and not an ownership payout. Other employees were similarly compensated and there was no dispute that they were nonowners. The trial testimony demonstrated that plaintiff's distributions were included in RCG's monthly financial statements designated as "profit distribution." Distributions made to other nonowners were also included in these statements and were designated as such.

¶ 32    RCG was a limited liability company for the majority of the time at issue. There is no dispute that the operating agreement named *only* Collins and Rosenthal as class A members and, therefore, majority owners and managing members of RCG. Plaintiff was a nominal owner as a class C member. Plaintiff's class C nominal ownership did not afford him the benefits and burdens commonly inured as a result of ownership. Distributions do not necessarily create ownership. Ownership, instead, provides a member with company profits, but also requires the owner to contribute to the company's expenses and liabilities. There was no evidence showing plaintiff was treated as a class A member; rather, plaintiff concedes he was a class C member. Plaintiff did not purchase his 2.5% ownership interest. Further, there was no evidence demonstrating that plaintiff was liable for the expenses or operating costs of RCG. Tellingly, the operating agreement was signed by Collins and Rosenthal and was not signed by plaintiff as an owner. The operating agreement provided class A members with the right to authorize distributions, which Collins and Rosenthal did to plaintiff as well as other members based on performance and various agreements with Collins and Rosenthal. The operating agreement *did not* provide plaintiff with 2.5% ownership interest or 2.5% of the liabilities of the company, and plaintiff unquestionably did not have 2.5% voting rights for member decisions.

¶ 33    Rosenthal did testify, "anybody that got a profit allocation, got a profit allocation on what we called up and down, which means that they shared both in profits and losses." Horgan clarified, however, that all class C members could be responsible for losses in the event of a catastrophic incident wherein the capital contributions of the class C members could be

made available to creditors. Accordingly, the loss component was in line with plaintiff's responsibility as a class C member and not a result of obtaining equity interest. Moreover, there was no evidence demonstrating plaintiff was responsible for losses over and above his class C membership. In addition, Rosenthal testified that, in the event of the sale of the company, he and Collins planned to provide plaintiff as well as other members a percentage of the profits; however, the operating agreement did not provide the class C members with the ability to participate in the sale of the company. Tellingly, the profit distribution to plaintiff upon the sale of the company was discretionary.

¶ 34    The trial court's ruling that RCG did not necessarily demonstrate an intent to provide plaintiff with 4% equity by giving of an additional 4% in distributions from 2002 until 2004 further supports our decision related to the disputed 2.5%. Specifically, the trial court said:

> "[Plaintiff puts] forth the proposition that there is an oral contract between the plaintiff, Mr. Downs, and RCG by way of a conversation that Mr. Downs had with Mr. Rosenthal regarding this four percent. Plaintiff also points out that subsequent to this conversation, the plaintiff began to receive distributions in the amount of six and a half percent interest in the business.
>
> And I must say, gentlemen, that I don't agree. I think there are some material facts missing from a contract. I got the opportunity to listen to Mr. Rosenthal testify. And I came away convinced that the parties failed to have a meeting of the minds, if you will. I believe that the parties walked away from that meeting with two different ideas of what was to take place. And so I just–I just don't see or sense that there was truly a contract formed by the conversation that these gentlemen had."

¶ 35    Simply stated, the issuance of 2.5% distributions to plaintiff did not demonstrate plaintiff was in fact a 2.5% equity owner of RCG. The trial court's equitable decision to the contrary was against the manifest weight of the evidence where the facts, as concluded by the court, did not demonstrate that RCG waived the condition precedent required by the parties' employment agreement.

¶ 36    Moreover, RCG's failure to provide plaintiff with an accurate "book value" of the company did not establish evidence of ownership. There is nothing in the employment agreement showing that it was RCG's burden to provide the "book value" to plaintiff. The employment agreement merely required plaintiff to execute a note in the amount of 2.5% of the "book value" of the company in order to obtain the same interest. "Book value" was left undefined. Even giving deference to the trial court's credibility finding regarding the three conversations between plaintiff and Collins during which plaintiff attempted to execute a note, nothing Collins said barred plaintiff from executing that note in the appropriate amount. Plaintiff testified:

> "Q. And why didn't you give a note for book value for your two and a half percent interest in RCG?
>
> A. I attempted–I can recall three separate occasions I approached Mr. Collins about the execution of a note, and for various reasons he said it wasn't necessary.
>
> Q. What was the first time you approached Mr. Collins about the note?
>
> A. Shortly after I came over–I approached him and–said, Bob, I'd like to take care

of this. There's an open issue in the book. And he said–it's really hard to determine the book value–I think the term was it's not science, it's art. And then he shared with me, in terms of the receivable, he had a substantial receivable due from Mr. Rosenthal that would affect the valuation of the company, in terms of book value; and he wanted to–essentially, he said, that's my responsibility, I got to take care of that. And he also made reference that there was [*sic*] some additional amounts owed to him personally by Mr. Rosenthal, and he was trying to figure out how to handle those.

Q. Was that the only time you and Mr. Collins discussed the topic of you giving a note for your two and a half percent equity interest in RCG?

A. No. I had another conversation with him in 1998. Early 1998 I approached him again, 'cause I felt that, essentially, I owed Bob money. The interest came out of his side of the allocation and–I wanted to pay my bills–I said, Bob, you know, I'd like to settle this out, get this behind us–And he said, hey, focus on making money, focus on doing a good job. That's enough for me, don't worry about it.

Q. Did you have any other discussions with him about executing a note for you equity interest?

A. As we got down to the end of 1998, we were going to essentially dole out the partner allocations–And I was going to give Bob the opportunity, if he felt that he was entitled to a note or whatever he felt that he was appropriate, I just wanted to make sure that I was forthright, in terms of coming to him and asking.

Q. What did he say?

A. Once again, he said don't, you know don't worry about it. I think he said you can buy me lunch as a response.

Q. Did you buy him lunch?

A. Yes, I did."

¶ 37    Plaintiff's own testimony reveals that, although he offered to provide payment for the ownership interest, nothing Collins said demonstrated that he would be given the ownership interest without execution of the note. The conversations merely demonstrate Collins' failure to give the "book value." Nothing prevented plaintiff from obtaining the accurate "book value" by other means, especially when obtaining that information was the key to becoming an owner of the company. The "book value" was ascertainable. Horgan, the CFO, testified that he reported the "book value" on monthly financial documents. Plaintiff testified that his definition of "book value" was based on the outstanding money Rosenthal owed the company and the amount of equity Collins had in RCG. These figures could have been found when plaintiff had the conversations with Collins. Plaintiff admitted as much when he testified that "from a purely accounting standpoint" he had an idea of the "book value" at the time of the conversations with Collins. The bottom line is plaintiff knew that he had an obligation to pay 2.5% of the "book value" of RCG in order to obtain the same in equity interest, and he took advantage of Collins' lackadaisical approach when plaintiff inquired into providing the requisite note. There is no testimony that plaintiff even actually tendered a note to Collins or that Collins refused the tender. Plaintiff cannot, and has not, argued that as a result of the conversations he thought that Collins' offer to perform well and buy lunch

were acceptable substitutes to purchasing the ownership interest. Rather, plaintiff's testimony reveals that his attempts to perform his portion of the contract were limited to the three conversations and if Collins "didn't want to receive payment" then plaintiff was "thankful."

¶ 38    Furthermore, the trial court's finding excusing plaintiff's performance of the condition precedent on the basis of impossibility was erroneous. At the outset, we acknowledge plaintiff's argument that the trial court did not apply the doctrine of impossibility, but, rather, used the term "in its lay sense." Our review of the record and the context within which the term was used, however, leads us to conclude that the trial court was applying the doctrine of impossibility as a legal principle. The trial court said, "I believe that [plaintiff's] lack of performance was attributable to the *impossibility* of performing. And that *impossibility* was as a result of the conduct of the defendants." (Emphasis added.)

¶ 39    Impossibility of performance is a contractual doctrine excusing performance "where performance is rendered objectively impossible due to destruction of the subject matter of the contract or by operation of law." *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill. App. 3d 1, 6, 933 N.E.2d 860 (2010) (citing *Leonard v. Autocar Sales & Service Co.*, 392 Ill. 182, 187, 464 N.E.2d 477 (1945)). "Impossibility of performance, as a ground for rescission of a contract, refers to those factual situations where one party to a contract finds that the purposes for which a contract was made have become impossible to perform on one side." 30 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 77:95, at 593 (4th ed. 2004). The doctrine "does not apply to excuse performance 'as long as it lies within the power of the promisor to remove the obstacle of performance.' [Citation.]" *YPI 180 N. LaSalle Owner, LLC*, 403 Ill. App. 3d at 8. Rather, application of the doctrine "requires that the circumstances creating the impossibility were not and could not have been anticipated by the parties, that the party asserting the doctrine did not contribute to the circumstances, and that the party demonstrate that it has tried all practical alternatives available to permit performance." *Illinois-American Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1106, 774 N.E.2d 383 (2002). Impossibility in the contractual sense is defined as "[a] fact or circumstance that excuses performance because *** the method of delivery or payment has *failed*." Black's Law Dictionary 824 (9th ed. 2009). Moreover, the doctrine is applied only in narrow circumstances " 'due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances.' " *YPI 180 N. LaSalle Owner, LLC*, 403 Ill. App. 3d at 6 (quoting *Kel Kim Corp. v. Central Markets, Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987)).

¶ 40    The doctrine of impossibility was not applicable in the case before us. There was no destruction of the subject matter of the contract. See, *e.g.*, *Parker v. Arthur Murray, Inc.*, 10 Ill. App. 3d 1000, 1002-03, 295 N.E.2d 487 (1973) (after the plaintiff suffered injuries rendering him incapable of continuing dance lessons, the court ruled he was entitled to recovery of the prepaid sums). Rather, as previously discussed, it was within plaintiff's power to ascertain the "book value" for his equity interest; plaintiff contributed to his failure to execute the note by not attempting to do so beyond merely mentioning on three occasions that he had an open obligation. See *American National Bank in De Kalb v. Richoz*, 189 Ill. App. 3d 775, 779-80, 545 N.E.2d 550 (1989) (although the defendants were prevented from

-11-

selling the property on which they held four outstanding notes to the plaintiff because the plaintiff had changed the locks to the property, the doctrine of impossibility did not excuse the defendants from performing their obligation to repay the notes because the property was not an essential element to the parties' contract). This was not a situation where Collins prevented plaintiff from executing the requisite note or refused to accept a tendered note. See *Lukasik v. Riddell, Inc.*, 116 Ill. App. 3d 339, 346, 452 N.E.2d 55 (1983) (the plaintiff was entitled to retirement benefits even though he did not work until the age of 65 as required by the condition precedent where the plaintiff continued to work for the defendant as promised until he was fired by the defendant, thus preventing him from performing the condition precedent of remaining an employee until the age of 65); *Barrows v. Maco, Inc.*, 94 Ill. App. 3d 959, 967-68, 419 N.E.2d 634 (1981). Here, there was no failure of delivery of payment because there was no actual attempt at *delivering* payment.

¶ 41    Additionally, the trial court's conclusion that plaintiff's "lack of performance was attributable to the impossibility of performing" is legally inconsistent with its finding that defendant did not waive its right to the note. The trial court concluded that the actions of Collins and Rosenthal did not demonstrate an intent to waive plaintiff's requirement to execute a note for the book value of the equity interest at issue. Importantly, plaintiff conceded at trial that he was capable of generating the "book value"; therefore, it was not impossible for him to perform his portion of the contract. The trial court's ruling that the same actions upon which it found no waiver somehow created an impossibility of performance is legally inconsistent. See generally *Mrowca v. Chicago Transit Authority*, 317 Ill. App. 3d 784, 786, 740 N.E.2d 372 (2000) (legally inconsistent verdicts must be set aside and a new trial granted). Simply stated, the evidence did not demonstrate impossibility.

¶ 42    Contrary to plaintiff's assertion, the facts of this case are distinguishable from those in *Wasserman*. In *Wasserman*, the appellate court concluded that a manager of a car dealership was entitled to his shareholder status pursuant to the terms of the parties' oral contract where he provided the requisite capital for his percentage of ownership interest and the defendants accepted the payment and filed documents reporting the capital and issuance of the equivalent shares. The *Wasserman* court found that the execution of a written agreement restricting transfer of the shares was not a condition precedent of the issuance of the shares to the plaintiff but, rather, merely was a "buy-sell" agreement negotiated between the parties. In the alternative, the court determined that the defendants waived any condition precedent by accepting the payment and issuing the stock and were, therefore, estopped from denying the benefits of shareholder status to the plaintiff where the defendants' actions prevented the execution of the written "buy-sell" agreement. *Wasserman*, 202 Ill. App. 3d at 236-39. In comparison, the instant case indisputably involves a condition precedent that was not complied with by plaintiff and does not involve principles of estoppel where plaintiff received a salary as compensation for his performance of the employment agreement and was not entitled to a 2.5% equity interest unless he complied with the condition precedent of purchasing that interest at "book value."

¶ 43    We do not come to our decision lightly. The judge, however, misapplied the law. Moreover, we are mindful that plaintiff was a sophisticated business person. He had a law degree and was a certified public accountant with decades of experience in the industry, who

left a self-described excellent job to join RCG and Prime as the CEO of both companies. Plaintiff entered into a contract that plainly stated he was required to execute a note for the "book value" of 2.5% of the company in order to obtain that percentage of ownership interest. Plaintiff could have contracted for countless other terms to protect himself from the situation at issue, but he did not. See generally *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 670-71, 891 N.E.2d 1 (2007) (sophisticated parties are capable of bargaining for explicit contract terms). Plaintiff accepted the plain terms as written and gambled that he would receive an ownership interest despite failing to execute the note because of the relationship he enjoyed with Collins. Although the annual 2.5% distributions give the specter of ownership where the percentage of ownership at issue matched the distributions, as we stated previously, the distributions in and of themselves did not establish ownership. The trial court seemingly agreed when it refused to find that plaintiff obtained the additional 4% ownership despite receiving an additional 4% in profit distributions.

¶ 44   Because we have found plaintiff was not a 2.5% owner of RCG, we conclude plaintiff was not entitled to 2.5% profit/loss distributions since 2004 and, consequently, was not entitled to prejudgment interest on that award. We, therefore, need not address those arguments.

¶ 45                    II. Additional 4% Ownership Interest

¶ 46   In his cross-appeal, plaintiff contends the trial court erred in concluding the parties did not have an oral contract granting plaintiff an additional 4% ownership interest in RCG. In the alternative, plaintiff contends he is entitled to damages pursuant to the doctrine of *quantum meruit*.

¶ 47   Whether parties intended to enter into a contract is a question of fact left to the trial court unless it is against the manifest weight of the evidence. *Seymour v. Williams*, 249 Ill. App. 3d 264, 270, 618 N.E.2d 966 (1993).

¶ 48   Plaintiff testified that in 2002 he had a series of brief conversations with Rosenthal in which plaintiff requested a 4% increase equity distribution for his increased obligations that began when Collins went on sick leave. Plaintiff also requested a 1.5% profit distribution for two employees, Maureen Downs and Horgan. Plaintiff threatened that, if he and the other two employees did not receive the increased interest, he would take Maureen and Horgan and RCG customers to a competing company. Rosenthal testified that he agreed to provide the increased distributions, but that they were "profit sharing" distributions and not equity. All three distributions were recorded on the company's monthly profit distribution schedules without any indication of ownership or indication regarding the nature of the distributions. It is undisputed that Maureen and Horgan were not equity owners of RCG.

¶ 49   "For an oral contract to be valid and enforceable, its terms must be definite and consistent. [Citation.] When it appears that the language used or the terms proposed are understood differently by the parties, there is no meeting of the minds and no contract exists. [Citation.]" *Martin v. State Farm Mutual Automobile Insurance Co.*, 348 Ill. App. 3d 846, 855, 808 N.E.2d 47 (2004). When confronted with an unresolvable ambiguity in a purported

contract, a court may conclude that the contract does not exist. *People v. Cherry Valley Public Library District*, 356 Ill. App. 3d 893, 899, 828 N.E.2d 748 (2005).

¶ 50     The trial court concluded that, after hearing the witness testimony and reviewing the transcripts,[4] the parties did not have a meeting of the minds as to the character of the additional 4%. The court recognized that subsequent to the conversation at issue plaintiff began receiving an additional 4% in distributions; however, the court concluded that no contract was formed because the parties did not agree on the character of the compensation. Based on the evidence presented, we do not find that the trial court's judgment was against the manifest weight of the evidence.

¶ 51     Plaintiff contends, in the alternative, that he is entitled to additional compensation pursuant to the doctrine of *quantum meruit*. Plaintiff argues that he would not have performed the additional services for profit participation because he was interested in growing his equity participation. Plaintiff maintains that the additional compensation he received was inadequate for the additional services he rendered.

¶ 52     Plaintiff raised this equitable theory for the first time before this court. Issues not raised before the trial court are waived on appeal. *Greenwich Insurance Co. v. RPS Products, Inc.,* 379 Ill. App. 3d 78, 85, 882 N.E.2d 1202 (2008). Plaintiff argues that it could not have raised the equitable theory because he assumed the trial court would have concluded that the parties had a contract for the 4% equity interest. We disagree. Plaintiff could have raised the theory in the alternative as he has on appeal or could have asserted it in a motion to reconsider. Waiver, however, is a restriction on the parties and not on this court. *Catholic Charities of Archdiocese of Chicago*, 318 Ill. App. 3d at 311.

¶ 53     Plaintiff received 4% additional compensation in the form of profit distributions for his additional services from 2002 until 2004. Specifically, the 4% increase provided plaintiff with an additional $520,000 in compensation. *Quantum meruit* compensates for services rendered. *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979, 931 N.E.2d 810 (2010). Recovery is given for the reasonable value of services not gratuitously rendered and to which the defendant benefits. *Id.* There is no dispute that plaintiff was compensated for the additional services he rendered beginning in 2002. Plaintiff fails to cite to any authority demonstrating that the doctrine of *quantum meruit* entitles him to compensation in perpetuity. We, therefore, reject plaintiff's *quantum meruit* claim.

¶ 54                                      CONCLUSION

¶ 55     We conclude that the judgment of the trial court finding that plaintiff owns 2.5% of RCG and awarding him profits on a going-forward basis was against the manifest weight of the

---

[4]Contrary to plaintiff's assertion, the court was not required to determine which party's characterization of the distribution was correct in order to make a credibility determination. After assessing the credibility of the parties, the court concluded that neither was on the same page. In its oral ruling, the trial judge said, after reviewing Downs' testimony, that he did not agree with Downs' opinion regarding the formation of a contract for the additional 4% and that, after hearing Rosenthal's testimony, he was convinced that the parties did not have a mutual agreement.

evidence and must be reversed. We consequently reverse the trial court's award of prejudgment interest on that award. We, however, affirm the trial court's judgment finding that plaintiff did not obtain an additional 4% equity interest in the company.

¶ 56        Reversed in part; affirmed in part.

¶ 57        PRESIDING JUSTICE ROBERT E. GORDON, concurring in part, and dissenting in part:

¶ 58        I concur with the portion of the majority's opinion that affirms the trial court's finding that the parties did not have an oral contract to grant plaintiff an additional 4% ownership interest in RCG. *Supra* ¶¶ 46-51. I also concur, for the reasons stated by the majority, with the majority's denial of plaintiff's cross-appeal based on the doctrine of *quantum meruit*. *Supra* ¶¶ 51-53.

¶ 59        However, I must respectfully dissent, for the reasons explained below, from the portion of the majority's opinion that reverses the trial court's finding that plaintiff had a 2.5% ownership interest.

¶ 60        As the majority observes, this is an issue about waiver. *Supra* ¶ 28. Waiver is established by the conduct of the parties. *Supra* ¶ 28. It is a question of fact, and an appellate court can overturn a trial court's finding of waiver only if it is against the manifest weight of evidence. *Supra* ¶ 28. There was certainly evidence here to support the trial court's finding of waiver, so it was not against the manifest weight. *Supra* ¶¶ 29-37 (where the majority discusses the evidence and explains why it did not find the evidence as persuasive as the trial court did).

¶ 61        The trial court did list–as only one of its reasons supporting waiver–that plaintiff did not execute the note because defendants made it "impossible," or thwarted him, and thus waived the necessity of executing the note at that time. It is clear that the trial court is using the word "impossible" in the lay sense rather than as an attempt to invoke the formal, legal doctrine of impossibility. That is why the trial court made no reference to the requirements or elements of this legal doctrine. The fact that this doctrine is also known by other names, such as the doctrine of impracticability and the doctrine of commercial frustration, makes it more likely that the word may be used in a lay sense. *Pancoe v. Singh*, 376 Ill. App. 3d 900, 911 (2007) (using the terms "impossibility" and "impracticability" interchangeably in a discussion of the doctrine); *Illinois-American Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1106 (2002) (discussing the very "similar" doctrines of "commercial frustration" and "impossibility").

¶ 62        Plaintiff makes this very argument, that the trial court used the word "impossible" in a lay sense, and the majority rejects this argument by stating that its review of the record convinced it that the trial court was referring to the doctrine–in other words, that the majority found support for the doctrine in the record. *Supra* ¶ 38. But then the majority goes on to find no support for the doctrine in the record, which is the very reason to think that the trial court was not using it.

¶ 63        Given our standard of review, I cannot reverse based on these facts. As the majority

-15-

observed, the question of whether actions waived a condition precedent is a question of fact, and we will not overturn the trial court's factual finding unless it is against the manifest weight of the evidence. *Supra* ¶ 28. A finding is against the manifest weight of the evidence only when the opposite conclusion is readily apparent or when the finding appears to be unreasonable, arbitrary, or not based on the evidence. *Vancura v. Katris*, 238 Ill. 2d 352, 386 (2010). "This deferential standard is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. McDonough*, 239 Ill. 2d 260, 266 (2010).

¶ 64  Here, the trial court listened to plaintiff's testimony and believed him that there were conversations between him and Collins that there was no need to execute the note at that moment. *Supra* ¶¶ 9, 16, 36. In essence, according to Collins, it would be better to wait until the whole debt situation with Rosenthal was cleared up. *Supra* ¶¶ 9, 16, 36. If you accept plaintiff's testimony, as the trial court did, then the trial court's ruling makes perfect sense. Since there was only a waiver of performance at that time, the trial court found both that plaintiff received the 2.5% ownership interest and that he had to perform now.

¶ 65  For the above reasons, I would affirm the trial court's ruling in its entirety.