2021 IL App (1st) 182200-U

THIRD DIVISION
June 30, 2021

Nos. 1-18-2200 and 1-18-2201, Consolidated

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| SANDY TSAI, STEALTH PROPERTIES, LLC, JOHN DONGAS, CASTLE REALTY INVESTMENTS, LLC, and BLUE ISLAND GD INVESTMENTS, | ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees/Cross-Appellants, | ) ) | |
| v. | ) ) | No. 12 CH 28187 |
| JERRY KARLIK, KEITH GILES, JORDAN KARLIK, and KARGIL BLUE ISLAND LLC, | ) ) ) ) | Honorable Anna H. Demacopoulos, |
| Defendants-Appellants/Cross-Appellees. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

ORDER

¶ 1    *Held*: We affirm the trial court's judgment ordering disgorgement of the defendants' interest in the company. The trial court did not err in refusing to award punitive damages, but certain awards of compensatory damages are reversed and remanded for recalculation.

¶ 2    The parties were investors in a business known as 15th Street Blue Island, LLC (15BI). The business was formed in 2006 for the purpose of developing condominiums on a vacant parking lot located in Chicago. Before the project broke ground, the global economy crashed and the plan to develop condominiums was no longer feasible. The parties modified their plan to

develop rental residences, which was considered a more feasible plan under the economic conditions. However, that project never broke ground.

¶ 3    Jerry Karlik and Keith Giles are the principals of Kargil Blue Island, LLC (KBI). KBI was the manager of 15BI. This case arose when plaintiffs accused Karlik and Giles of self-dealing and misfeasance in their roles as manager of 15BI.

¶ 4    After a bench trial, the court entered judgment against defendants on plaintiffs' claims, dissociated defendant KBI as a member and the manager of 15BI, and ordered the forfeiture of KBI's interest in 15BI. The court awarded plaintiffs compensatory damages but denied their request for punitive damages. Defendants appeal the disgorgement of KBI's interest in 15BI and certain damages, and plaintiffs cross-appeal from the trial court's denial of punitive damages. These appeals were consolidated.

¶ 5    For the following reasons, we affirm the trial court's judgment disassociating KBI from 15BI and forfeiting its interest in the business. We affirm the trial court's denial of punitive damages, but we reverse certain awards of compensatory damages and remand for recalculation of appropriate amounts.

¶ 6                                    BACKGROUND

¶ 7    Defendants Karlik and Giles also jointly own Frank & Giles, LLC (F&G), and Kargil Development Partners (KDP). Karlik, Giles, and Spiros Picoulas, an F&G realtor, formed 15BI for the purpose of developing a vacant parking lot (15BI Property) located at 15th Street and Blue Island Avenue in Chicago. The 15BI operating agreement allows the manager to enter into service agreements with entities affiliated with KBI.

¶ 8      The parties proceeded to a bench trial in November 2017. They presented testimony, stipulations, and financial exhibits. Briefly stated, the evidence adduced at trial showed the following.

¶ 9      Plaintiffs Sandy Tsai, Stealth Properties, LLC, John Dongas, Castle Realty Investments, LLC, and Blue Island GD Investments are Class A members of 15BI. They contributed a total of $3.7 million in exchange for a 47% interest in 15BI.

¶ 10     By contrast, defendant KBI was the sole Class B member of 15BI. KBI made no capital contribution but held the remaining 53% interest as the manager of 15BI. Section 5.1.1 of 15BI's operating agreement gave the manager (KBI) "full, exclusive and complete discretion, power, and authority *** to *** operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs." Although Section 5.3.2 stated the manager is not entitled to compensation for services performed for 15BI, Karlik claimed that KBI was compensated with a 53.75% ownership interest in 15BI for serving as 15BI's manager.

¶ 11     In 2006, KDP entered a purchase agreement to acquire the 15BI Property for $3.72 million. Pursuant to that agreement, KDP deposited an initial earnest money payment of $100,000 from 15BI accounts into an escrow account. The purchase agreement also specified that F&G would receive a commission from the seller at closing.

¶ 12     In June 2007, Karlik signed a purchase agreement on behalf of 15BI to acquire property known as the Testa Parcel, which was located immediately south of the 15BI Property and owned by Testa Produce, for $6,250,000. The stated reason for purchasing the Testa Parcel was to expand 15BI's development of apartment rentals. This purchase agreement also required a $100,000 deposit of earnest money that was sourced from 15BI funds. In an unusual move for

the purchaser of real estate, Karlik negotiated an increase in the purchase price by $250,000 and provided for payment of a commission to F&G. He testified the commission was "for making the introduction."

¶ 13    KBI eventually abandoned its efforts to purchase the Testa Parcel in 2010 and as a result 15BI lost approximately 70% of its earnest money.

¶ 14    Meanwhile, in November 2007, 15BI closed on the purchase of the 15BI Property. Due to the subsequent recession, the original mixed-use development plan was no longer viable. 15BI explored alternatives and opted to develop rental apartments. This required design and zoning changes.

¶ 15    The planning, design, and zoning work was performed by KDP and F&G. Karlik's son Jordan handled the day-to-day operations while other F&G employees assisted with administrative matters. When F&G ceased operations, KBI, as the manager of 15BI, hired Jordan on an hourly basis to continue performing the work he had been doing as an employee of F&G. Additionally, the architectural firm Fitzgerald & Associates entered a standard engagement agreement to provide updated plans that included the Testa Parcel for a flat fee. Meanwhile, Karlik and Giles negotiated with the bank to purchase the note on the 15BI Property at a reduced price.

¶ 16    In 2008, Karlik and Giles sold a portion of KBI, which managed and owned a percentage of 15BI, to new investors, Gangas and Housakos, for approximately $750,000. Karlik testified that the law firm of Branson & Kahn invoiced 15BI and 15BI paid for its work on that sale. Defendants stipulated that work "should not have been billed through Blue Island."

¶ 17                              Trial Court's Judgment

- 4 -

1-18-2200 & 1-18-2201, Cons.

¶ 18    After trial, the court issued a memorandum opinion and judgment on September 14, 2018, finding in favor of plaintiffs and against defendants[1] Jerry Karlik, Keith Giles, KBI, and Jordan Karlik. The court noted KBI owed fiduciary duties to plaintiffs under 15BI's operating agreement and the Limited Liability Company Act (LLC Act).

¶ 19                                        Duty of Loyalty

¶ 20    The court found that defendants breached their duty of loyalty in pursuing the Testa deal, making payments to "affiliate entities," and selling a portion of KBI to new investors.

¶ 21                                        Testa Deal

¶ 22    According to the court, "From its inception until its failure, the Testa deal was beyond Defendants' authority as described in the Operating Agreement and was not in the best interests of 15BI." The operating agreement stated the purpose of 15BI was to develop the 15BI Property for mixed use and the cover page of each plaintiff's subscription package referred to a condominium development project. The operating agreement referenced only the 15BI Property and there is no mention of the Testa Parcel.

¶ 23    Moreover, the court noted that defendants' own expert testified the Testa deal presented competition with the 15BI project, especially because lenders usually require a single purpose entity. Giles admitted he was uncertain which entity would ultimately take title of the Testa Parcel. On the other hand, Karlik insisted the plan from the start was that 15BI would have an interest in the Testa Parcel. However, the court noted the illusory nature of Karlik's certainty became clear when he testified that 15BI would have "an *option* to buy this piece of property."

_____

[1] The court entered a default judgment against Spiros Picoulas, the F&G realtor. He is not a party to these consolidated appeals.

¶ 24    Despite uncertainty in 15BI's interest, defendants used 15BI's funds to pay $100,000 in earnest money for the purchase of the Testa Parcel and did not notify plaintiffs of the deal until months later. Meanwhile, defendants negotiated an increase in the purchase price by $250,000 for the payment of commission to F&G. When the deal was cancelled, $30,761 of the earnest money was refunded. But the refund was not returned to 15BI and instead transferred to KDP. Defendants also used 15BI funds to pay the law firm Bronson & Kahn $19,038.04 in legal fees associated with the deal. Similarly, they paid the architectural firm Fitzgerald and Associates $94,055.76 in design fees "for designing both the proposed building for the 15BI property and the Testa parcel." However, the court rejected the architect's testimony that those fees would not have differed much if the Testa Parcel were excluded because "the building proposed for the Testa parcel has a much larger footprint than the one proposed for the 15BI [Property]." The court found defendants' misconduct evidenced a disregard for their duty to act with good faith in managing 15BI.

¶ 25                        Payments to Affiliated Entities

¶ 26    The trial court found defendants made various improper payments to their affiliated entities, KDP and F&G, and directly to Jordan Karlik. The court noted the parties only disputed the propriety of certain stipulated amounts in their exhibits.

¶ 27    As to KDP, between May 9, 2007 and January 12, 2011, 15BI paid KDP approximately $30,200. (Stipulation 13.) Between September 12, 2007 and February 13, 2009, $180,000 was transferred from 15BI's money market account to KDP. (Stipulation 17.) On November 7, 2007, $100,000 was transferred from 15BI to an escrow account for the purchase of the Testa Parcel; 30% of that amount was refunded when the deal was terminated in March 2010. (Stipulation 21.) The $30,761 refund from the Testa deal was deposited into an account owned by KDP.

(Stipulation 22.) The court stated plaintiffs' exhibit B-9 showed Karlik instructed 15BI's accountant to treat the $150,000 due from KDP as a "generic account receivable without the [KDP] name." The court also stated plaintiffs' exhibit G-25 showed purported overhead payments for 2008 and 2009 of $120,000 due from KDP and $105,000 due from F&G were reclassified as "capitalized soft costs."

¶ 28    As to F&G, between September 4, 2007 and March 12, 2012, 15BI paid F&G $164,301.63. (Stipulation 14.) Between August 14, 2008 and November 1, 2009, $105,000 was transferred from 15BI's money market account to F&G. (Stipulation 18.) On September 24, 2007, $120,000 was transferred from 15BI to F&G as a broker's commission before the closing on the 15BI Property. (Stipulation 26.) Another $120,000 of 15BI funds was transferred to F&G for the same reason on November 8, 2007. (Stipulation 27.) However, the court stated pursuant to the purchase agreement, it was the seller's obligation to pay commission, not 15BI's.

¶ 29    Meanwhile, 15BI made payments to Jordan for $676.29 in claimed expenses between February 2007 and June 2012, and for $3,997.75 between July 2011 and 2012. (Stipulations 15 and 16.)

¶ 30    Although the parties stipulated to those amounts in 15BI funds paid or transferred to defendants' affiliates, the court noted their documentation was cryptic at best. The court stated it was clear, however, from a review of F&G and KDP's ledgers that whenever affiliate accounts were near zero, a transfer would be made from 15BI and classified as a "chargeback" or "overhead." The court noted the overhead payments to KDP were preceded by emails about low account balances.

¶ 31    From April 2008 to February 2009, $120,000 was transferred to KDP. Moreover, defendants paid Kahr Real Estate Services $15,000 to train F&G employees in Excel for

purposes unrelated to 15BI. They also pocketed the interest on the down payments in the escrow account. The court found these transfers were a breach of defendants' duty of loyalty.

¶ 32     Relatedly, the trial court found defendants' careless and deceitful accounting practices violated their fiduciary obligations under 15BI's operating agreement and the law. The court stated the operating agreement requires the manager to maintain accurate financial records, which did not occur. Although no exhibits were produced for the years 2008 to 2011, the court noted the testimony of Giles that in 2009, 15BI spent $75,000 for "overhead" and $58,731 for "payroll and admin," when there was no marketing agent, real estate agent, or construction company. According to the 2009 F&G General Ledger, 15BI was the only entity that paid into F&G for overhead yet the accounts payable showed no expenditures for 15BI. This pattern continued through 2012 for a total of $269,301.63. The court also stated certain charges for administrative costs and marketing seemed "inexplicable" in 2010, when "Jordan was the only employee and there [was] no real estate agent to pay given that there was no building to market."

¶ 33                              Selling a Portion of KBI to New Investors

¶ 34     The trial court also found defendants breached their duty of loyalty by selling a portion of KBI to new investors, Thomas Gangas and Peter Housakos. The court reasoned that defendants' failure to promptly notify plaintiffs about the addition of Gangas and Housakos to KBI placed 15BI at risk of loan default. The court cited Karlik's testimony about being advised by attorneys to update the ownership information with the lender or be in default. The court noted that defendants used 15BI funds to pay Bronson & Kahn $19,038.04 in attorney fees to document these transactions.

¶ 35                                          Duty of Care

¶ 36    The trial court also found that defendants breached their duty of care by hiring Jordan as project manager of 15BI. Jordan testified he provided market research and financial modeling, helped with zoning matters, worked with the architect, and acted as a liaison with the City and lender. However, Jordan had no prior experience in commercial and residential real estate development. His father Jerry hired him two years after he graduated college to run the daily operations of 15BI's development project, which never progressed beyond zoning during his employment from 2006 – 2011. The court considered the hiring of Jordan as another example of defendants' failure to act in the best interests of 15BI and negotiate at arms-length with affiliates.

¶ 37    Moreover, it bears noting the court found Jordan not liable to plaintiffs for the other defendants' wrongful acts. He owed no fiduciary duties to plaintiffs as an employee of F&G or KDP.

¶ 38    The court awarded plaintiffs the following in compensatory damages:

1.    $460,180.12 for payments to KDP,

2.    $389,301.63 for payments to F&G,

3.    $4,674.04 for payments to Jordan, and

4.    $138,086.08 for payments related to the Testa deal.

¶ 39    The court also found that expulsion of KBI was warranted in this case, commenting on defendants' numerous breaches of their fiduciary duties and 15BI's operating agreement. "In short, the list of Defendants' wrongful acts is shockingly long and more than warrants expulsion from 15BI pursuant to 805 ILCS 180/35-45(6)." Thus, the court dissociated KBI as a member and the manager of 15BI pursuant to section 35-45(6) of the LLC Act (805 ILCS 180/35-45(6) (West 2018)). The court disgorged KBI "of its compensation of the 53.75% ownership interest in

15BI for its breach of fiduciary duties." The court ordered defendants to pay statutory prejudgment interest on the compensatory damages.

¶ 40                                    ANALYSIS

¶ 41    Defendants contend the trial court erred in disgorging KBI's interest in 15BI pursuant to the LLC Act, and certain aspects of the award of compensatory damages and prejudgment interest are erroneous because the court miscalculated the amount of the judgment, applied an incorrect legal standard to breach of fiduciary duty cases, or misconstrued the operating agreement. They dispute the following aspects of the compensatory damages award: $150,000 in earnest money paid to KDP for the 15BI Property; expenses for work on the Testa Parcel; and expense and payroll reimbursements to KDP, F&G, and Jordan.

¶ 42    As a preliminary matter, this court took two motions with this case: plaintiffs' motion to strike a specific assertion of fact with no record citation in defendants' opening brief and plaintiffs' motion to strike the statement of facts in defendants' reply brief and response to cross-appeal. Defendants responded to the second motion, arguing its reply brief and response to cross-appeal directly respond to plaintiffs' arguments, which were premised upon inaccurate assertions in their statement of facts. We deny both motions to strike but will disregard any information that is not based in the record on appeal. See, *e.g.*, *Tekansky v. Pearson*, 263 Ill. App. 3d 759, 763 (1994) (denying motion to strike but disregarding any improper information in all the briefs).

¶ 43                      Disgorgement of KBI's Interest in 15BI

¶ 44    First, defendants contend the trial court committed reversible error when it disgorged KBI's compensation of a 53.75% interest in 15BI. Defendants argue the LLC Act does not provide for disgorgement as a remedy for dissociation but rather expressly preserves a dissociated member's equity interest. The trial court disassociated KBI as a member pursuant to

section 35-45(6) of the LLC Act (805 ILCS 180/35-45(6) (West 2018)). Section 35-45(6) reads as follows:

> "A member is dissociated from a limited liability company upon the occurrence of any of the following events:
>
> * * *
>
> (6) On application by the company or another member, the member's expulsion by judicial determination because the member:
>
>> (A) engaged in wrongful conduct that adversely and materially affected the company's business;
>>
>> (B) willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under Section 15-3; or
>>
>> (C) engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the business with the member." 805 ILCS 180/35-45(6) (West 2018).

¶ 45    Defendants argue that "[u]nder the applicable version of the [Act,] the effect of KBI's disassociation from 15BI should have been a mandatory buy-back of KBI's membership interests pursuant to the mandates of Sections 35-55(a) and 35-60, not disgorgement." Defendants rely on the version of section 35-55 "that was in effect at the time the Operating Agreement was entered." At that time, section 35-55 required the distributional interest of a dissociated member to be purchased and reads as follows:

> "(a) *Upon a member's dissociation the company must cause the dissociated member's distributional interest to be purchased under Section 35-60.*

- 11 -

(b) Upon a member's dissociation from a limited liability company:

(1) the member's right to participate in the management and conduct of the company's business terminates, except as otherwise provided in Section 35-4, and the member ceases to be a member and is treated the same as a transferee of a member;

(2) the member's fiduciary duties terminate, except as provided in subdivision (3) of this subsection (b); and

(3) the member's duty of loyalty under subdivisions (1) and (2) of subsection (b) of Section 15-3 and duty of care under subsection (c) of Section 15-3 continue only with regard to matters arising and events occurring before the member's dissociation, unless the member participates in winding up the company's business pursuant to Section 35-4." (Emphasis added.) 805 ILCS 180/35-55 (West 2016).

¶ 46  However, the legislature amended section 35-55 in 2017 so that when the trial court entered its judgment in this case on September 14, 2018, the requirement to purchase the distributional interest of a disassociated member had been repealed:

"(a) Upon a member's dissociation from a limited liability company:

(1) the member's right to participate in the management and conduct of the company's business terminates, except as otherwise provided in Section 35-4, and the member ceases to be a member and is treated the same as a transferee of a member;

(2) the member's fiduciary duties terminate, except as provided in subdivision (3) of this subsection (a);

(3) the member's duty of loyalty under subdivisions (1) and (2) of subsection (b) of Section 15-3 and duty of care under subsection (c) of Section 15-3 continue only with regard to matters arising and events occurring before the member's dissociation, unless the member participates in winding up the company's business pursuant to Section 35-4; and

(4) subject to Section 30-25 and Article 37, any distributional interest owned by the person immediately before dissociation in the person's capacity as a member is owned by the person solely as a transferee.

(b) A person's dissociation as a member of a limited liability company does not of itself discharge the person from any debt, obligation, or other liability to the company or the other members which the person incurred while a member." 805 ILCS 180/35-55 (West 2018).

¶ 47     The issue we must resolve is which version of the statute applies: the repealed version in effect when the business was formed, which requires the purchase of a disassociated member's interest, or the statute in effect at the time of judgment, which does not require the company to buy back the interest? For the following reasons, we conclude the new version of the statute controls here.

¶ 48     Defendants' initial contention is twofold. First, defendants argue "the 2017 amendment was not made retroactive, so the prior version in effect when the parties formed 15BI and executed the Operating Agreement controls their rights." Second, defendants argue "the trial court's disgorgement injunction is barred even under the amended LLC Act" because under the

1-18-2200 & 1-18-2201, Cons.

amended statute the disassociated member "is treated the same as a transferee of a member" (805 ILCS 180/35-55(a)(1) (West 2018)), which defendants argue, "retains all distribution rights held by the transferred equity position" (805 ILCS 180/30-10(e) (West 2018)). Defendants claim under the amended statute, KBI "should have retained its equity distribution rights in 15BI and simply been treated as a transferee."

¶ 49    Plaintiffs respond the transaction that determines which version of the statute applies is the disassociation itself and not the execution of the operating agreement because the former is when the right to have an interest purchased as a "disassociated member" accrues. In this case, because the order disassociating KBI occurred after the legislature amended the statute, the pre-amended version does not apply. In response to defendants' argument that it must be treated as a transferee of a member, plaintiffs argue that under section 15-5(b)(4) of the LLC Act (805 ILCS 180/15-5(b)(4) (West 2018)), the operating agreement controls the rights of transferees and under the operating agreement, not only are transfers prohibited but any purported transferees are not entitled to receive distributions from the company.

¶ 50    "We review the issue of retroactive application of a statute under a *de novo* standard of review." *Bank of New York Mellon as Trustee for Certificate Holders of CWALT, Inc., Alternative Loan Trust 2005-47cb, Mortgage Pass-Through Certificates, Series 2005-47CB v. Sperekas*, 2020 IL App (1st) 191168, ¶ 16. The "interpretation and applicability" of a statute is a question of law this court reviews *de novo*. *Lewis v. Lead Industries Association*, 2020 IL 124107, ¶ 36.

¶ 51    In determining whether an amended statute may be applied retroactively, we follow the two-step approach established by the Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). First, if the legislature expressly prescribes the statute's temporal reach, we will give

1-18-2200 & 1-18-2201, Cons.

effect to that expression of legislative intent. *Thomas v. Weatherguard Construction Co., Inc.*, 2015 IL App (1st) 142785, ¶ 64. Second, if there is no express statement about the statute's temporal reach, we must determine whether the new statute would have retroactive effect; absent a retroactive impact, the amended statute will apply retroactively. *Id.*

¶ 52    Illinois courts need not go beyond the first step of the *Landgraf* approach considering section 4 of the Statute on Statutes. *Perry v. Department of Financial and Professional Regulation*, 2018 IL 122349, ¶ 41. If the temporal reach is not clearly indicated in the text of the new law, then the legislature's intent in that regard is provided by default in section 4. *Id.* Section 4 "contemplates the existence of proceedings after the new or amended statute is effective to which the new procedure could apply." (Internal quotation marks omitted.) *Id.* ¶ 43 (quoting *People v. Hunter*, 2017 IL 121306, ¶ 31). Section 4 "represents a clear legislative directive as to the temporal reach of statutory amendments and repeals: those that are procedural in nature may be applied retroactively, while those that are substantive may not." (Internal quotation marks omitted.) *Thomas*, 2015 IL App (1st) 142785, ¶ 65 (quoting *Caveney v. Bower*, 207 Ill. 2d 82, 92 (2003); and citing 5 ILCS 70/4 (West 2000)). A procedural change in law prescribes a mechanism for enforcing rights or involves pleading, evidence, and practice. *Deicke Center-Marklund Children's Home v. Illinois Health Facilities Planning Board*, 389 Ill. App. 3d 300, 303 (2009). By contrast, a substantive change establishes, creates, or defines rights. *Id.* at 304.

¶ 53    However, the general savings clause of section 4 does not apply to repeals of special statutory remedies, as in the case here. See *Atkins v. Deer & Co.*, 177 Ill. 2d 222, 236 (1997) (Miller, J., specially concurring) (section 4 of the Statute on Statutes does not apply to legislation that repeals special statutory remedies); accord *Shelton v. City of Chicago*, 42 Ill. 2d 468, 473 (1969). Rather, "the unconditional repeal of a remedial statute without a saving clause stops all

- 15 -

pending actions where the repeal finds them." *Id.* at 226-27. Additionally, where the act does not expressly indicate whether it should be applied prospectively or retroactively, it is presumed to apply retroactively. *Id.* at 232 (citing *Randall v. Wal-Mart Stores, Inc.*, 284 Ill. App. 3d 970, 973 (1996)). "In the absence of a general savings clause or a savings clause within the repealing act, the effect of the repeal of a statute 'is to destroy the effectiveness of the repealed act *in futuro* and to divest the right to proceed under the statute, which, except as to proceedings past and closed, is considered as if it had never existed.' " (Internal quotation marks omitted.) *U.S. Bank, N.A. v. Coe*, 2017 IL App (1st) 161910, ¶ 9 (quoting *Isenstein v. Rosewell*, 106 Ill. 2d 301, 310 (1985)). Under these circumstances, if final relief under the repealed statute has not been granted, it may not be after the repeal. *Id.* (citing *Shelton*, 42 Ill. 2d at 473-74). The appellate court must dispose of the case based on the law in effect at the time of its decision. *Id.* (citing *Vance v. Rankin*, 194 Ill. 625, 627-28 (1902)).

¶ 54    When the legislature amended section 35-55 and removed the buy-back provision in 2017, it also repealed section 35-60, which according to defendants, "provides the *procedure* pursuant to which the membership interest buy-back must happen." (Emphasis added.) KBI's entitlement to a buy-back of its distributional interest in 15BI is a statutory creation and not "an expectation that is so far perfected that it cannot be taken away by legislation." *Coe*, 2017 IL App (1st) 161910, ¶ 18. The trial court issued its judgment dissociating KBI as a member of 15BI in September 2018, well after the effective date of amended section 35-55 and the repeal of section 35-60, namely July 1, 2017. KBI's dissociation in September 2018 triggered the effects of a member's dissociation prescribed in the amended version of 35-55, which no longer include the buy-back provision. Public Act 99-637, which amended section 35-55 and repealed section 35-60, does not indicate whether the changes should apply prospectively or retroactively; thus,

1-18-2200 & 1-18-2201, Cons.

there is a rebuttable presumption the changes apply retroactively. See Pub. Act 99-637 (eff. July 1, 2017) (amending 805 ILCS 180/35-55; repealing 805 ILCS 180/35-60); *Atkins,* 177 Ill. 2d at 232. Moreover, final relief under the repealed statute may not be granted after the repeal in July 2017. See *Coe*, 2017 IL App (1st) 161910, ¶ 9.

¶ 55    We conclude the pre-amended version of section 35-55 and repealed section 35-60 (805 ILCS 180/35-55, 35-60 (West 2016)) do not control this case; the trial court applied the version of the LLC Act in effect at the time of judgment. Therefore, the statute in effect at the time of judgment did not require the purchase of the dissociated defendant's distributional interest. In so concluding, it bears noting that Illinois courts no longer use a vested rights analysis to determine temporal reach. *Perry*, 2018 IL 122349, ¶ 64 (citing *Commonwealth Edison Co. v. Will County Collector*, 196 Ill. 2d 27, 39 (2001)).

¶ 56    Next, we turn to defendants' argument "the trial court's disgorgement injunction is barred even under the amended LLC Act" because under the amended statute the disassociated member "is treated the same as a transferee of a member" (805 ILCS 180/35-55(a)(1) (West 2018)). The question then becomes whether 15BI's operating agreement prohibits the transfer of distributional interests resulting from a member's involuntary dissociation. If the operating agreement prohibits such transfers, defendants may still not be entitled to a buy-back of KBI's distributional interest under the current version of section 35-55(a)(4), which provides that any distributional interest owned by a member is solely owned as a transferee after dissociation. See 805 ILCS 180/35-55(a)(4) (West 2018).

¶ 57    Plaintiffs direct this court to section 6.1 of the operating agreement, which provides that a transferee has no distributional rights and reads as follows:

"6.1.1. Prohibition on Transfers. No Person may Transfer all or any portion of or any interest or rights in the Person's Membership Rights or Interest owned by the Member, and no Interest Holder may Transfer all, or any portion of, or any interest or rights in, any Interest. *** The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in violation of this Section shall not be entitled to *** receive distributions from the Company, or have any other rights in or with respect to the Membership Rights."

¶ 58    Section 15-5 of the LLC Act states that "[t]o the extent the operating agreement *does not otherwise provide*, this Act governs relations among the members, managers, and company. Except as provided in subsection (b), (c), (d), and (e) of this Section, an operating agreement may modify any provision or provisions of this Act governing relations among the members, managers, and company." (Emphasis added.) 805 ILCS 180/15-5(a) (West 2018). Subsection (b)(4) of section 15-5 of the LLC Act states the "operating agreement may not *** restrict the rights of a person, *other than a *** transferee* of a member's distributional interest, under this Act." (Emphasis added.) 805 ILCS 180/15-5(b)(4) (West 2018).

¶ 59    In their reply to plaintiffs' argument above, defendants claim the operating agreement is silent about the rights retained by dissociated members "and in no way purports to override the equity distribution rights given those members by the" LLC Act. Defendants argue section 6.1 of the operating agreement applies to attempts to "*voluntarily* transfer a membership interest" while the LLC Act "protects the equity rights of a member who is *involuntarily* dissociated." (Emphasis added.) Defendants argue the LLC Act does not convert a dissociated member to a

transferee, or to the "unsuccessful 'attempted transferees[]' addressed in § 6.1 of the Agreement." That is, defendants argue, despite section 15-5(b)(4) stating the rights of a *transferee* may be restricted by an operating agreement, "a dissociated member like KBI is *not a transferee*—it is an involuntarily removed full member." (Emphasis added). Moreover, section 6.1 of the operating agreement "does not contemplate actual transferees" because it "precludes them all together." The parties' arguments raise a question as to the construction of section 6 of the operating agreement, an issue that was not addressed in the trial court's judgment. The interpretation of a contract is a question of law subject to *de novo* review. *Ritacca Laser Center v. Brydges*, 2018 IL App (2d) 160989, ¶ 15.

¶ 60     The primary objective when construing a contract is to give effect to the intention of the parties. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). A court will consult the contractual language for the parties' intent and where the words are clear, a court will give those words their plain meaning. *Id.* However, where the language is susceptible to more than one meaning, it is ambiguous and the court can then consider extrinsic evidence of the parties' intent. *Id.* The parties' disagreement on the meaning of a contract term does not, alone, render that term ambiguous. *Id.* at 443. Thus, a reviewing court will not try to find ambiguity where none exist, and disagreements about contractual interpretation must be reasonable. *Midway Park Saver v. Sarco Putty Co.*, 2012 IL App (1st) 110849, ¶ 13.

¶ 61     We find the operating agreement clearly and unambiguously reflects the parties' intent to prohibit defendants' treatment as a transferee following the dissociation of KBI from 15BI. Defendants do not argue it is impermissible for the operating agreement to contain such a provision; defendants effectively only argue that it does not because the applicable provision does not contain the word "involuntarily."

¶ 62    "We presume that each contractual provision was inserted deliberately and for a purpose consistent with the parties' intent, and if possible we must interpret a contract in a manner that gives effect to all of the contract's provisions." *Kasper v. McGill Management Inc.*, 2019 IL App (1st) 181204, ¶ 39. "In determining the parties' intent, a court must read the contract as a whole and must attempt to give effect to, and harmonize, every part of the contract." *Sloan Biotechnology Laboratories, LLC v. Advanced Biomedical Inc.*, 2018 IL App (3d) 170020, ¶ 31. However, defendants essentially ask this court to focus on an isolated portion of the operating agreement—section 6.1.1—and "add new terms or conditions to which the parties do not appear to have assented, [or] write into the contract something which the parties have omitted," specifically adding the word "voluntarily," that "easily could have been included in the contract but [was] not." See *Gallagher v. Lenart*, 367 Ill. App. 3d 293, 301-02 (2006). We decline.

¶ 63    First, we find section 6.3 of the operating agreement instructive. That provision reads as follows:

> "6.3    Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become an Interest Holder but shall not become a Member. If the Company is continued as provided in Section 7.1.3, the successor Interest Holder shall have all the rights of an Interest Holder[2] but neither the predecessor nor the successor

---

[2]    Defendants make no argument they have any rights as an Interest Holder. We note this argument is forfeited from further consideration by this court. Points not argued are waived and shall not be raised in oral argument, or on petition for rehearing. *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 172976, ¶ 26, quoting Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017). Moreover, "Illinois law is well settled that other than for assessing subject matter jurisdiction, a reviewing court should not normally search the record for unargued and unbriefed reasons to reverse a trial court judgment. [Citations.]"

1-18-2200 & 1-18-2201, Cons.

> Interest Holder shall be entitled to receive in liquidation of the Interest, pursuant
> to the Act, the fair market value of the Member's Interest as of the date the
> Member involuntarily withdrew from the Company."

¶ 64    Although the operating agreement does not specify that its expansive definition of the term "Involuntary Withdrawal," includes a member's dissociation under the Act, we believe that read as a whole, section 6.3 of the operating agreement is a clear expression of the parties' intent to "modify [a] provision or provisions of this Act governing relations among the members, managers, and company" (805 ILCS 180/15-5(a) (West 2018)), to decline the rights in section 30-10(e) of the Act (805 ILCS 180/30-10(e) (West 2018)) provided by the remedy in section 35-55(a)(1) of the Act (805 ILCS 180/35-55(a)(1) (West 2018)). The parties intended that no one other than a *bona fide* member would receive any benefit from the company. Further evidence of that intent is found in section 6.1.1, which prohibits transfers by both members and interest holders and further states "[e]ach Member hereby acknowledges the reasonableness of the prohibition contained in this Section 6.1 in view of the purposes of the Company and the relationship of the Members." It would be incongruous to read section 6.1.1 as limited to involuntary transfers in the face of section 6.3 and the sweeping scope of the plain language of section 6.1.1.

¶ 65    Moreover, because the parties did not include the word "voluntarily" in section 6.1.1 of their operating agreement, there exists a presumption against its inclusion that defendants have failed to overcome. See *Lenart*, 367 Ill. App. 3d at 301-02 ("the presumption can only be

---

(Internal quotation marks omitted.)  *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 63 (Thomas, J., specially concurring).

overcome by an implication so strong as to be practically an express declaration."); see also *Estate of Willis v. Kiferbaum Construction Corp.*, 357 Ill. App. 3d 1002, 1008 (2005) (presumption against creating third-party liability). In *In re Marriage of Sweders*, 296 Ill. App. 3d 919, 922 (1998), a spouse argued that the term "emancipated" in the parties' marital settlement agreement applied only to the other spouse and not to her. It was "uncontroverted that the agreement [did] not expressly contain this limitation." *Id.* The court noted the "strong presumption *** against provisions that could easily have been included in the agreement but were not." *Id.* (citing *Prime Group Inc. v. Northern Trust Co.,* 215 Ill. App. 3d 1065, 1069 (1991)). The court held that "[b]ecause the agreement does not limit the definition of the term to the Husband only and the Wife has failed to overcome the presumption against the inclusion of this limitation, the Wife's argument fails." *Id.*

¶ 66    Similarly, in this case, section 6.1.1 of the operating agreement does not include a limitation to "voluntary" transfers. Defendants have offered nothing more than the operating agreement's silence as evidence of their intent to include this term, which as demonstrated herein is insufficient as a matter of law. Moreover, the operating agreement does specifically address similar types of involuntary withdrawals and provides for a similar proscription on the transfer of equitable interests due to such involuntary transfers. For example, "neither the predecessor nor the successor Interest Holder shall be entitled to receive in liquidation of the Interest, pursuant to the Act, the fair market value of the Member's Interest as of the date the Member involuntarily withdrew from the Company." This is a clear expression of the parties' intent. Regardless, "[b]ecause the agreement does not limit the definition of the term to [voluntary transfers] and [defendants have] failed to overcome the presumption against the inclusion of this limitation, the *** argument fails." See *Sweders*, 296 Ill. App. 3d at 922.

1-18-2200 & 1-18-2201, Cons.

¶ 67    The plain language of the operating agreement prohibits KBI from receiving any rights

under the Act as a transferee. Absent transferee rights, KBI has no right to its equitable interest[3]

in 15BI due to its dissociation. 805 ILCS 180/35-55(a)(1), (a)(4) (West 2018). Accordingly, we

have no need to reach defendants' alternative argument that disgorgement as an *equitable*

remedy was improper. The trial court properly applied the version of the Act in effect at the time

of judgment. The trial court's judgment disgorging KBI's equitable interest in 15BI pursuant to

the LLC Act is affirmed.

¶ 68                                    Damages

¶ 69    Next, defendants argue the trial court erroneously awarded damages for their breach of

         fiduciary duties in multiple categories. Generally, "when one breaches a fiduciary duty to

         a principal the appropriate remedy is within the equitable discretion of the court."

         (Internal quotation marks omitted.) *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st)

         133277, ¶ 53 (quoting *In re Marriage of Pagano*, 154 Ill. 2d 174, 190 (1992)).


¶ 70    "To uphold a contention that a damage award is contrary to the manifest weight of the

evidence, it must be found that the trial court ignored the evidence or that its measure of damages

_____

[3]      Compare *Downs v. Rosenthal Collins Group, L.L.C.*, 2011 IL App (1st) 090970, ¶ 12, in which
the plaintiff argued a 2.5% distribution from the company was based on an equitable ownership interest
and the defendants argued the monies were provided as a performance-based bonus. The appellate court
reversed the trial court's judgment finding the plaintiff had an equitable ownership interest in the
company because "as a condition precedent to obtaining his ownership interest, [the plaintiff] was
required to provide a note to RCG for 2.5% of the company's 'book value.' [The] [p]laintiff did not
comply with the terms of the agreement and, consequently, did not purchase an ownership interest in
RCG." *Downs v. Rosenthal Collins Group, L.L.C.*, 2011 IL App (1st) 090970, ¶ 24.

         In this case, the parties have not argued the failure of any condition precedent to KBI's obtaining
an equitable ownership interest in 15BI. *Cf. id.*, ¶ 29. Accordingly, *Downs* is distinguishable.

- 23 -

was erroneous as a matter of law." (Internal quotation marks omitted.) *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 607 (1999). "A fact finder's determination is against the manifest weight of the evidence where, upon reviewing the evidence in the light most favorable to the prevailing party, the opposite conclusion is clearly apparent or the finding is palpably erroneous or arbitrary and unsubstantiated by the evidence." *Chicago Transparent Products, Inc. v. American National Bank & Trust Co. of Chicago*, 337 Ill. App. 3d 931, 940 (2002).

¶ 71     Defendants argue the evidence establishes that a July 17, 2007 transfer of $150,000 from an account owned by 15BI at National City Bank with an account number ending in "5666" to an escrow account at Cole Taylor Bank with an account number ending in "2255" with Chicago Title as the escrow trustee, was "used at the closing to purchase the Property, for the exclusive benefit of 15BI." Defendants assert all the funds in the Chicago Title account were used at the closing to purchase the 15BI Property and that plaintiffs' expert admitted the July 17, 2007 transfer went into the Chicago Title escrow account. Specifically, defendants argue that the contemporaneous financial records demonstrate that the funds in the Cole Taylor escrow account were transferred to Chicago Title on the date of closing and disbursed to purchase the Property for 15BI. In further support of their argument, defendants claim plaintiffs can point to no other source for the earnest money used to purchase the property on the same date the Chicago Title account was emptied.

¶ 72     Plaintiffs counter, defendants' own "books and records unequivocally show the $150,000 complained about *** was transferred to Karlik and Giles" and 15BI's general ledger shows KDP still owes 15BI that money. Plaintiffs argue the KDP general ledger shows $150,000 from 15BI deposited to KDP's escrow account at Cole Taylor bank on August 8, 2007. The ledger shows interest accrued on the Cole Taylor account and, on November 8, 2007, a transfer of the

total balance of the Cole Taylor account to Giles and Karlik. Plaintiffs respond to defendants' reliance on the disbursement statement from Chicago Title for the sale of the Property by noting that although the disbursing statement "shows a total of $450,000 of earnest money [(which, we note, the document states was received on November 8, 2007)] , *** it in no way shows the source of those funds or more importantly that the $150,000 complained of *** was paid to the seller at closing." On the contrary, plaintiffs point to an April 29, 2008 email from Karlik to Steven Swidler instructing him that the $150,000 due from KDP "should be *** treated as an (*sic*) generic receivable without the Kargil name." Plaintiffs additionally rely on an email which they purport demonstrates that "the $150,000 due from KDP [to 15BI] was still being discussed as a debt from KDP *** on January 2, 2012." Plaintiffs argue this refutes defendants' claim KDP did not actually owe 15BI $150,000 (because that money was used to purchase the property for 15BI). According to plaintiffs, "both experts acknowledged the aforesaid $150,000 still appears on the books and records of 15BI as a receivable due from KDP."

¶ 73 As noted above, defendants previously argued that plaintiffs "can point to [no] other source for the $450,000 (plus interest) in earnest money that indisputably was received by the title company on November 8, 2007, the same date the [Chicago Title] *2255 Escrow Account was emptied." Defendants have abandoned this argument in their reply brief, a fact we note but from which we draw no adverse conclusions or inferences. But see *Mathieu v. Venture Stores, Inc.*, 144 Ill. App. 3d 783, 798 (1986) ("Venture has failed to respond to this contention in its reply brief and we deem the matter to have been abandoned."); *Kurtzon v. Kurtzon*, 339 Ill. App. 431, 434-35 (1950).

¶ 74 Defendants' expert Jason Wright testified concerning the $150,000 at issue. Wright testified there were "a number of documents" that demonstrate "that $150,000 came from

[15BI's] account *** and went to the escrow account at Chicago Title & Trust. The same escrow account that we see on the closing disbursement or the escrow disbursement statement." Wright admitted defendants' records are "saying *** that there is a receivable due to 15BI from KDP" for the $150,000 transferred to Chicago Title, but "the actual flow of funds, is that this money never went to KDP. It went into the escrow account" which was "applied in the purchase of the property owned by 15BI." Regarding the disbursement reflected in defendants' records to Karlik and Giles, purportedly of the $150,000 plus interest in equal shares, Wright testified it was "merely a bookkeeping entry. There was no cash distributed to either member." Wright explained this was done because once KDP transferred its interest in the property to 15BI it no longer had any interest in the escrow account and had to do something with it. Wright testified he saw no record of a transfer from 15BI to KDP for $150,000. Wright disagreed with the ledger entry showing that 15BI was owed $150,000 by KDP because he "actually traced the flow of funds coming from 15BI into an account, an escrow account that was held by 15BI and was ultimately used to purchase the property that 15BI owns." Wright testified he relied upon bank records and account numbers to trace the funds rather than just the ledger because the bank records come from "independent third parties."

¶ 75    Wright admitted on cross-examination that he only relied on the disbursement statement from Chicago Title for his conclusion that the $150,000 went into the escrow account and the escrow account was applied to the purchase. Wright admitted that an entry in KDP's general ledger shows a transfer from 15BI on August 8, 2007 to KDP for $150,000. Then the ledger has an entry on November 8, 2007 showing that all the funds in the Cole Taylor escrow account (approximately $258,000) were transferred out, although Wright testified "I don't believe it was transferred out." Plaintiffs' counsel directed Wright to a separate entry in the KDP general

journal dated November 8, 2007 showing disbursements to Giles and Karlik totaling $258,000. On redirect, Wright testified noncash transactions are sometimes booked in that manner because the bookkeeper does not know how to book the transaction. Wright agreed that the general ledger for 15BI still shows $150,000 due from KDP. The trial court asked Wright if there was independent corroboration other than the document opening the escrow account that indicated the funds in the escrow account came from KDP and Wright later testified the account number referenced in that document and the account number for the Cole Taylor account matched.

¶ 76    The record contains sufficient evidence that 15BI transferred $150,000 to KDP and that KDP distributed those funds to Giles and Karlik individually rather than to Chicago Title to purchase the 15BI Property to support the award of damages. The evidence that a transfer of $150,000 from an account at National City Bank with an account number ending in "5666" owned by 15BI to an escrow account at LaSalle National Bank with Chicago Title as the escrow trustee is not sufficient to overcome the finding of the trier of fact, *i.e.*, that the disputed funds did not go into the escrow account used to purchase the 15BI Property but instead went to Giles and Karlik individually, as the general ledger states, because the opposite conclusion is not apparent and the trial court's conclusion is based on evidence, is not arbitrary, and is not unreasonable. *Gittlitz*, 2014 IL App (1st) 133277, ¶ 52.

¶ 77    In support of its argument that the National City Bank transfer supports its position, defendants rely on a "Check Request and Fund Transfer Form" directing a transfer from National City Bank to LaSalle National Bank and for that transfer to be credited to a Chicago Title account and a contemporaneous email stating an additional deposit of $150,000 was due to the Chicago Title escrow account for the 15BI Property in July 2007. Defendants' expert testified he "traced the flow of funds coming from 15BI into an account, an escrow account that was held by

15BI and was ultimately used to purchase the property" relying on documents from National City and Chicago Title demonstrating that $150,000 was transferred from 15BI to the Chicago Title escrow account. However, we do not see in his testimony a clear indication that the funds in a Cole Taylor bank account—which contained the disputed funds transferred from 15BI to KDP—were the same funds in the National City account. To the extent defendants ask that we draw that inference, although it is a reasonable one, it is for the trier of fact to draw reasonable inferences from the evidence. *Gonet v. Chicago & N. W. Transp. Co.*, 195 Ill. App. 3d 766, 776 (1990).

¶ 78    The trier of fact in this case had before it accounting records showing a disbursement from the account containing the disputed funds to Giles and Karlik individually. Although defendants' expert testified the general ledger entry was just an "accounting entry" made because the bookkeeper may not have known how to treat the alleged transfer of those funds to Chicago Title, that testimony reflected the expert's opinion about the ledger entry. The trial court was at liberty to reject that testimony or any other portion of defendants' expert's testimony. "The trial court is free to evaluate the expert evidence presented and accept or reject it in whole or in part. [Citation.] The trial court need not accept the opinion of one expert, even where that expert's testimony is not directly countered by the expert opinion of another." *Villareal on Behalf of Villareal v. Peebles*, 299 Ill. App. 3d 556, 561-62 (1998); see also *Nelson v. Quarles & Brady, LLP*, 2018 IL App (1st) 171653, ¶ 155 ("as the trier of fact, the judge may accept one expert opinion over another").

¶ 79    Moreover, the trial court need not resolve inconsistencies in the evidence in defendants' favor, accept defendants' alternative inferences, or accept its expert's opinions as to the tracing of those funds. See, *e.g.*, *Walsh v. Finley*, 51 Ill. 2d 174, 176 (1972) ("The jury had to, and did

resolve this conflict in the testimony. Under these conditions, the circumstantial evidence in connection with the case *** became a significant, if not a crucial factor ***."); see also 34A Ill. Law and Prac. Trial § 256 (and cases cited therein) ("In a bench trial, the judge weighs the evidence and draws from it proper inferences and conclusions. When the evidence is conflicting, the judge must weigh it and consider it in view of all the evidence. It is the function of the trial court to resolve conflicting testimony by assessing the credibility of the witnesses and determine the weight to be accorded their testimony.").

¶ 80    Finally, the fact that all the funds in the Chicago Title escrow account went toward the purchase of the Property tells us nothing. We agree with plaintiffs that such evidence "in no way shows the source of those funds or more importantly that the $150,000 complained of *** was paid to the seller at closing." See, *e.g.*, *Matlock v. Illinois Department of Employment Security*, 2019 IL App (1st) 180645, ¶ 35 (Lavin, J. dissenting) (citing *Manning v. Department of Employment Security*, 365 Ill. App. 3d 553, 556 (2006) ("We are obligated to give great deference to the factual findings of the [trier of fact,] and these findings are not against the manifest weight of the evidence, since appellant supplied no documentary evidence to back up his claim.").

¶ 81    The trial court's judgment awarding damages based on the transfer of funds from 15BI to KDP allegedly for the initial earnest money on the property 15BI now owns is supported by sufficient competent evidence in the record. Therefore, defendants' argument must fail. *Gittlitz*, 2014 IL App (1st) 133277, ¶ 52; see also *Graham v. Mimms*, 111 Ill. App. 3d 751, 767 (1982) ("a finding is not against the manifest weight of the evidence merely because the record might support a contrary decision").

¶ 82                    Payments for Attempted Development of the Testa Parcel

1-18-2200 & 1-18-2201, Cons.

¶ 83    Defendants argue that the trial court miscalculated the $138,086.08 damage award for development of the Testa Parcel by $24,992.28. Defendants claim the court only found two categories of payments in connection with the Testa Parcel, *i.e.*, $19,038.04 to the law firm Bronson & Kahn for legal fees associated with the deal and $94,055.76 to the architectural firm Fitzgerald and Associates "for designing both the proposed building for the 15BI property and the Testa parcel." The sum of those two amounts is $113,093.80, or $24,992.28 less than the damage award calculated by the court.

¶ 84    Plaintiffs respond that they presented exhibits evidencing each payment made with 15BI funds but were unrelated to the development of the 15BI Property. They also summarized those payments, which total $138,086.08, in an exhibit. We address these disputed amounts as follows.

¶ 85                    Fitzgerald & Associates Architectural Design Fees

¶ 86    Defendants further maintain the $94,055.76 in architectural fees should not be included in the damages award because they were a legitimate expense of 15BI.

¶ 87    Defendants point out that Patrick Fitzgerald, the principal of the architectural firm who was questioned about his firm's engagement letter with 15BI and various invoices. Fitzgerald testified his fees were for services related to redesigning the 15BI Property from a condominium development to apartment rentals. Fitzgerald stated the firm was hired to "go back and redo the planned development that had been done previously to accommodate apartment development." Pursuant to a standard engagement agreement, his firm agreed to provide schematic designs and zoning applications for the 15BI Property and the Testa Parcel for a flat fee of $100,000. The design plan for the Testa Parcel was a mirror image of the design for the 15BI Property but only larger. Fitzgerald guessed that any increased cost for the Testa design plan would be nominal because "repeating a design like that is strictly a matter of mouse clicks." In its memorandum

opinion, the trial court found Fitzgerald's testimony, that his flat fee would not have changed if the Testa Parcel were not included, "defies belief" because the design plan for the Testa Parcel was much larger.

¶ 88    Based on the record, however, we find the trial court ignored evidence showing the firm rendered services benefitting both properties. Fitzgerald testified about his firm's standard engagement agreement to provide schematic designs and zoning applications for both properties for a flat fee of $100,000. He explained how generating a design plan for the Testa Parcel simply involved some mouse clicks because the property was a larger mirror image of the 15BI Property. Then, he estimated that any increased cost for creating the Testa design plan would be nominal. Notwithstanding Fitzgerald's credibility on this point, the trial court's decision to award damages to plaintiffs for Fitzgerald's entire fee ignores the fact the architectural firm provided services for the benefit of the 15BI Property. See *King, LLC*, 2020 IL App (1st) 191307, ¶ 28. Accordingly, we reverse the $94,055.76 judgment award for architectural fees.

¶ 89                    Legal Fees to Acosta, Kruse, & Zemenides, LLC

¶ 90    Regarding the Acosta legal fees, the trial court's written judgment describes Acosta's work as the zoning work "necessary before 15BI could begin construction and development of the 15BI parcel." The trial court noted the amended property development application was approved by the Chicago Zoning Board "allowing mixed use of the [P]roperty with 216 units." The court wrote that 15BI paid Acosta $19,125 for its zoning legal work. The trial court's judgment awarding plaintiffs $138,086.08 "for payments related to the Testa Project" does not include a breakdown of the court's calculation of that total. However, plaintiffs appear to concede it comes from their exhibit, which lists $19,125 in payments to Acosta supported by three separate exhibits. Those three exhibits state those payments were for (1) "Professional

- 31 -

Services rendered in connection with rezoning of 15th & Blue Island Property" dated October 24, 2008; (2) "Per Agreement (2 of 8)" and other expenses dated December 8, 2008; and (3) "Per Agreement (3 of 8)" dated February 23, 2009. Based on the trial court's express written finding that the work was required before proceeding with the project, which is not contradictory to the exhibits on which plaintiffs rely, inclusion of these $19,125 in fees paid to Acosta is "palpably erroneous *** and unsubstantiated by the evidence." *Chicago Transparent Products, Inc.*, 337 Ill. App. 3d at 940.

¶ 91 The record supports finding, and the parties do not dispute, that the trial court included these Acosta legal fees in the amount of damages for "payments related to the Testa Project." Therefore, that portion of the trial court's judgment awarding plaintiffs $19,125 in damages for legal fees paid to Acosta is reversed.

¶ 92 Fees Paid to Bronson & Kahn and Testa Parcel Earnest Money

¶ 93 Defendants challenge this portion of the damage award on the grounds the expenditures were proper for the benefit of 15BI. The trial court ruled defendants breached their fiduciary duty of care to the Class A members of 15BI because "the Testa deal was beyond Defendants' authority as described in [section 2.3 of] the Operating Agreement and was not in the best interests of 15BI."

¶ 94 "When dealing with limited liability companies and the fiduciary duties owed to them, we must look—first, foremost, and primarily—to the Act." *800 South Wells Commercial LLC v. Cadden*, 2018 IL App (1st) 162882, ¶ 31. Our duty is to ascertain and give effect to the intent of the legislature via the statutory language. *Id.* Matters of statutory construction are reviewed *de novo*. *O'Casek v. Children's Home and Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008).

¶ 95    Pursuant to section 15-1 of the LLC Act, in a manager-managed LLC, "the manager, alone, is responsible for the 'management and conduct of the company's business,' and 'exclusively,' decides any matter relating to the company's business." *Cadden*, 2018 IL App (1st) 162882, ¶ 32 (citing 805 ILCS 180/15-1(c) (West 2014)). However, "section 15-5 of the [LLC] Act allows a limited liability company to 'enter into an operating agreement to regulate the affairs of the company and the conduct of its business.' " *Id.* ¶ 34 (citing 805 ILCS 180/15-5(a) (West 2014) ("the Act applies to the extent that the company's operating agreement does not")). We review the trial court's construction and application of the operating agreement *de novo*. *McManus v. Richards*, 2018 IL App (3d) 170055, ¶ 18 ("We review *de novo* a trial court's interpretation of a contract.").

¶ 96    The operating agreement in this case names KBI the manager of 15BI but does not set forth its fiduciary duties to the Class A members; thus, the LLC Act governs where the operating agreement is silent. *Cadden*, 2018 IL App (1st) 162882, ¶ 34; see 805 ILCS 180/15-3 (West 2018).

¶ 97    To succeed on a breach of fiduciary duty claim, the complainant must establish that a fiduciary duty existed, that duty was breached, and the breach proximately caused an injury to the complainant. *Happy R Sec., LLC v. Agri-Sources, LLC*, 2013 IL App (3d) 120509, ¶ 49. "Our standard of review is whether the trial court's finding of breach of fiduciary duty was against the manifest weight of the evidence." *1515 N. Wells, L.P. v. 1513 N. Wells, L.L.C.*, 392 Ill. App. 3d 863, 874 (2009).

¶ 98    Defendants argue the trial court's finding that the attempted development of the Testa Parcel was a breach of its fiduciary duties is against the manifest weight of the evidence. They reason the Testa development would have increased the value of the original 15BI development.

As support, defendants point to testimony that (1) the neighborhood was not yet established as residential, (2) further development would extend the neighborhood making the location more attractive and legitimate, and (3) the Testa development would have provided more rental units and allowed exploitation of economies of scale. Plaintiffs respond the evidence establishes that the Testa project would have competed with the 15BI project because, "Defendants' exhibits establish that 15BI Property was to be developed 'congruent' with the Testa Parcel" and that in such a scenario the concern over self-competition "comes to fruition because Testa will be competing with 15BI."

¶ 99     Plaintiffs argue the testimony that development of the Testa Parcel would result in improved net returns "is only true to the extent Plaintiffs were included in the Testa deal at no cost like Defendants." We agree; whether inclusion in the deal "at no cost" would be required for plaintiffs to enjoy the increased number of units and economies of scale the Testa development would purportedly bring, plaintiffs had to be included in the deal first.

¶ 100   The trial court found 15BI's interest in the Testa Parcel was "uncertain and far from guaranteed" and that "15BI was not likely to participate in the Testa deal." Given the evidence about the tentative and conditional nature of plaintiffs' interest in the Testa Parcel, we cannot say the trial court's judgment is against the manifest weight of the evidence.

¶ 101   Finally, even assuming 15BI's operating agreement authorized defendants to pursue the Testa development, defendants nonetheless had a fiduciary duty to do so in good faith. 805 ILCS 180/15-3(d), (g)(3) (West 2018). The trial court found they did not act in good faith. That finding is not against the manifest weight of the evidence.

¶ 102                               KDP Expenses

1-18-2200 & 1-18-2201, Cons.

¶ 103    In this case, the trial court awarded a total of $460,180.12 in damages for payments from 15BI to KDP. Defendants' $30,200 figure is taken from the parties' stipulation as to payments between May 9, 2007 and January 12, 2011 as stated in the trial court's written judgment. Defendants cite record testimony concerning the disputed expenses. Defendants' expert testified the payments included were lower than he would have expected in the market. The invoices supporting the trial stipulation to the approximately $30,000 in payments to KDP are, for the most part, invoices for items such as travel, limousine, and other transportation services, utilities and office supplies, shipping services, and meals. The trial court's written judgment states that "[g]iven Defendants' admission that no contracts with affiliated entities of KBI existed, as well as Jerry Karlik's derisive comment that it would be 'silly' to adhere to Section 5.3.3 of the Operating Agreement, the Court finds all transfers discussed above *were in breach of Defendants' duty of loyalty* and therefore improper." However, the trial court did not, as defendants state, refer to or seem to apply section 5.2.2 of the operating agreement. The trial court did not make an express written finding as to whether these were "expenses reasonably incurred in connection with the activities of the Company" to which defendants would have had a right to reimbursement under section 5.2.2 of the operating agreement or whether the transactions were equitable and just. Instead, the trial court found defendants breached their fiduciary duty specifically because of their failure to comply, in its view, with the written agreement requirement of section 5.2.3 of the operating agreement and awarded the challenged damages. The trial court's findings are not against the manifest weight of the evidence. We therefore affirm the judgment of the trial court.

¶ 104                                      F&G Payroll

1-18-2200 & 1-18-2201, Cons.

¶ 105   The trial court also awarded damages totaling $389,301.63 for payments made to F&G which, according to defendants, allegedly includes a "reimbursement" of $164,302 in compensation on a *pro rata* basis for F&G employees for their work in providing "substantial development and administrative support for the day-to-day operations of 15BI and other similar development entities that Giles and Karlik were leading." Defendants argue the trial court did not make an express finding that these payments were excessive or inequitable to 15BI but instead assessed them as damages under its misinterpretation of section 5.3.3 of the operating agreement and that this constitutes reversible error. Defendants argue the trial court's judgment in this regard constitutes reversible error because under the correct standard—which they argue would be to apply section 5.3.2 of the agreement instead—the court could not find a fiduciary breach because F&G incurred the payroll expense in connection with the activities of 15BI and 15BI paid below-market rates for the F&G employees. Defendants also attack two factual determinations by the trial court and assert that, contrary to the trial court's findings, (1) there was "substantial payroll reimbursements to F&G from other projects and (2) there is "unrefuted evidence" that in 2009 "development support efforts were necessary, ongoing, and performed by employees of F&G." Defendants also note there is evidence in the record substantiating reimbursement for F&G employee time devoted specifically to 15BI in that they introduced check requests and invoices for all payroll reimbursements to F&G despite the lack of an "internal spreadsheet breaking down detailed payroll expenses among all F&G-supported entities for 2008-11." Alternatively, defendants assert that even if section 5.3.3 of the operating agreement applied, they would not be in breach of that provision because there was an oral arrangement to provide development support services.

¶ 106   Plaintiffs respond that regarding payments to F&G, defendants similarly failed to comply with section 5.3.3 of the operating agreement by failing to enter into a written agreement with F&G "clearly delineating the services to be provided by F&G and the compensation F&G would receive for such services." Plaintiffs also argue section 5.3.2 of the operating agreement "applies only to expenses incurred by KBI." Plaintiffs argue defendants did not satisfy their burden to prove with clear and convincing evidence that the payments to F&G were necessary for 15BI and fair and equitable. To the contrary, plaintiffs claim the "evidence showed payments were not based on services performed for the benefit of 15BI." The "evidence" upon which plaintiffs place this argument is the testimony that due to the financial crises the 15BI project had to be put on hold. The judgment of the trial court is not against the manifest weight of the evidence. We affirm the trial court.

¶ 107                                    Jordan Karlik

¶ 108   Defendants argue the trial court erroneously "disallowed" payment by 15BI of hourly wages and out-of-pocket expenses to Jordan Karlik for work related to the development of the 15BI Property after F&G ended its operations. Defendants claim the trial court "made no finding that 15BI failed to receive fair market value for these payments sufficient to support a fiduciary breach" and the payments were proper under section 5.3.2 of the operating agreement. Alternatively, defendants claim the payments to Jordan were proper under section 5.3.3 as Jordan testified to his oral agreement with 15BI to continue providing day-to-day rezoning and development efforts at "prevailing competitive rates."

¶ 109   Plaintiffs respond the trial court was not required to make that finding and defendants failed to show the payments to Jordan were fair and equitable to 15BI. The trial court's finding is not against the manifest weight of the evidence and therefore we affirm the trial court.

¶ 110                  Propriety of Damages Award for Disputed Payments

¶ 111   "[I]in any fiduciary relationship, the burden of proof shifts to the fiduciary to show by clear and convincing evidence that a transaction is equitable and just." (Internal quotation marks omitted.) *Labovitz v. Dolan*, 189 Ill. App. 3d 403, 413 (1989). Factors in determining whether a transaction is fair include a showing by the fiduciary that an open disclosure of relevant information was made, the consideration was adequate, and the principal had competent and independent advice before completing the transaction. *Schueler v. Blomstrand*, 394 Ill. 600, 611 (1946).

¶ 112   Regarding the propriety of the disputed payments, we find *Tully* instructive. In that case, the defendants argued the trial court erred in disgorging certain management fees that were expressly authorized under the operating agreement. *Tully*, 409 Ill. App. 3d at 680-81. Although the defendants earned the management fees, the reviewing court found the trial court did not abuse its discretion in ordering their forfeiture. *Id.* at 683. In so finding, the court noted the defendants willfully and deliberately breached their fiduciary duty for years, failed to be forthcoming with the plaintiffs, and used corporate assets for their own gain. *Id.*

¶ 113   We are unpersuaded by defendants' claim that they produced evidence showing the disputed payments were for the benefit of 15BI and at fair or below-market rates. Defendants are mistaken in their conclusory reliance on the testimony of their expert that the payments were at fair or below-market rates. See *Schueler v. Blomstrand*, 394 Ill. at 613 (defendants are mistaken that testimony must be accepted as clear and convincing proof solely because it was uncontradicted).

¶ 114   In this case, the trial court questioned whether 15BI actually received the value of the services charged to 15BI, whether defendants merely used "15BI as a piggy bank for their

personal endeavors," and whether 15BI actually needed the services paid for. The record supports the trial court's determination that defendants breached their fiduciary duties to plaintiffs during the period in which the challenged payments were made. Thus, we cannot say the trial court's inclusion of the disputed payments in the damage award is against the manifest weight of the evidence. The trial court's damage award for those payments is affirmed.

¶ 115                                      Sale of KBI Interest

¶ 116   Defendants initially asked this court to reverse the portion of the trial court's judgment finding defendants breached their fiduciary duties to plaintiffs by selling an interest in KBI to non-parties Gangas and Housakos. However, we will not address this issue because defendants withdrew it from consideration in a footnote in their reply brief: "Defendants address in turn each issue raised in their Opening Brief with the exception of §V, discussing the trial court's unsupported conclusion that Defendants' sale of membership interests in KBI somehow violated fiduciary duties to 15BI. That ruling was not tied to any monetary award in this case and, since the Opening Brief was filed, the risk of potentially broader consequences flowing from it has been reduced. Accordingly, Defendants withdraw their appeal of this erroneous but now inconsequential ruling."

¶ 117                         Cross Appeal—Denial of Punitive Damages

¶ 118   Plaintiffs cross-appeal the trial court's denial of their request for punitive damages without providing any details or explanation. Plaintiffs argue the trial court made numerous findings that would justify an award of punitive damages. They claim the trial court failed to analyze the factors used to determine whether punitive damages are warranted and denied their request without explanation. Plaintiffs ask this court to reverse the denial of punitive damages

1-18-2200 & 1-18-2201, Cons.

and "remand with instructions to consider all relevant factors and explain its reasoning for whether punitive damages are warranted." We decline.

¶ 119   Punitive damages are allowed for a breach of a fiduciary duty. *Flynn*, 2020 IL App (1st) 190784, ¶ 77. "The assessment of punitive damages is a highly factual decision and, as noted, should be a reflection of the factfinder's determination as to the degree of maliciousness evidenced by a defendant's actions." *Id.* Here, the trial court variously described defendants' conduct as intentional, done with total disregard, deceptive, shoddy, careless, deliberate, deceitful, egregious, flagrant, intentional, and willful. Plaintiffs point to no cases requiring a court to award both forfeiture of defendants' interest in KBI and punitive damages. See *id.* Additionally, defendants' actions cannot be construed as done with malicious intent. See, *e.g.*, *Brownridge Institute of Karate, Inc. v. Dorris*, 162 Ill. App. 3d 483, 487 (1987) (plaintiff's actions cannot be construed as done with malicious intent). The trial court awarded damages to compensate plaintiffs for defendants' avarice manifested through conduct done with callousness but not malice toward plaintiffs.

¶ 120   The trial court's judgments finding defendants breached their fiduciary duties in all respects, and denying plaintiffs' request for punitive damages, are affirmed. The trial court's assessment of damages is affirmed except the awards for (1) payments to Fitzgerald & Associates and (2) legal fees paid to Acosta, and we reverse the award for those payments. We remand for the recalculation of damages and prejudgment interest.

¶ 121                                  CONCLUSION

¶ 122   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part, reversed in part, and remanded for a recalculation of damages including prejudgment interest.

- 40 -

1-18-2200 & 1-18-2201, Cons.

¶ 123   Affirmed in part, reversed in part, and remanded with instructions.